[No. H012054. Sixth Dist. June 8, 1995.]

RAFAEL RADOVICH, Plaintiff and Appellant, v.
WILLIAM F. LOCKE-PADDON et al., Defendants and Respondents.

## COUNSEL

Krause, Baskin & Ballentine, Marshall Warren Krause and James S. Madow for Plaintiff and Appellant.

Grunsky, Ebey, Farrar & Howell, Frederick H. Ebey and Leslie J. Karst for Defendants and Respondents.

## OPINION

**BAMATTRE-MANOUKIAN, J.**—Plaintiff Rafael Radovich appeals from a judgment, for defendants William F. Locke-Paddon (an attorney) and the law firm by which Locke-Paddon was employed, based on summary adjudication of issues in consolidated civil actions. The trial court was called upon to answer two questions of law:

(1) Did Locke-Paddon or the law firm, in preparing a will for a client who died without executing the will, owe a duty of care to Radovich as a potential beneficiary named in the unsigned will? The trial court answered that they did not.

(2) Were any claims Radovich may have had against Locke-Paddon or the law firm, arising out of asserted breaches of fiduciary duties in other transactions, barred by the applicable statute of limitations? The trial court answered that they were.

We shall conclude that the trial court's answers were correct, and shall affirm the judgment.

The facts material to the issues before us are essentially undisputed.

Radovich married Mary Ann Borina (the decedent) in 1957. Shortly before they married, Radovich and the decedent signed a form of prenuptial agreement, prepared for the decedent by the law firm, which stated among other things that each party's property, owned at or acquired after the marriage, and each party's earnings after the marriage, should be and remain his or her separate property, and that "[n]o community property shall exist during the marriage . . . ."

It appears that the law firm may have prepared a will for Radovich in 1970; its provisions are not before us.

In November 1973 the decedent executed a will, prepared by the law firm, which, after specific gifts to Radovich and others, would give the residue of the estate to two charitable remainder trusts for the ultimate benefit of the Regents of the University of California upon the death of the last to die of Radovich, the decedent's sister, and the sister's husband. Under one of the trusts, specified income payments were to be made to Radovich during his lifetime, and then to the decedent's sister during her lifetime, and then to sister's husband during his lifetime. Under the other trust, similar payments were to be made to the decedent's sister during her lifetime, and then to Radovich during his lifetime, and then to the sister's husband during his lifetime.

In January 1974 the decedent and her sister entered into a written partnership agreement intended to be a memorandum of a preexisting farming and real estate investment partnership between them known as "Borina Orchards." The agreement, prepared by the law firm, included a "consent of husbands" form on the face of which Radovich and the sister's husband, by their respective signatures, acknowledged "that the partnership agreement involves property which is wholly the separate property of our wives and in which we have no part."

In June 1985 Radovich executed a will, prepared by Locke-Paddon, which recited in part that "[a]ll of my estate is my separate property. My wife and I have no community property, as more fully set forth in a written agreement between us dated May 9, 1957."

In the trial court Radovich asserted, and neither Locke-Paddon nor the law firm denied, that Locke-Paddon and the law firm represented Radovich in 1987, in connection with acquisition and leasing of real property, and in 1989, in connection with exercise by a tenant on the real property of an option to extend its lease.

On June 21, 1991, Locke-Paddon met with the decedent to discuss drafting a new will for her. At the meeting, Locke-Paddon learned that the decedent had been diagnosed as suffering from breast cancer, for which she had received chemotherapy treatments. In the trial court Radovich represented, and Locke-Paddon did not deny, that the purpose of the meeting was "to discuss the drafting of a new will under which [Radovich] was to receive 100% of the testamentary trust income for the rest of his life . . . ," and that Locke-Paddon did not discuss the new will with the decedent at any time after the June 1991 meeting.

Locke-Paddon declares that "I delivered a rough draft of [the decedent's] proposed new will to her on October 8, 1991, for her review and comments. Once this first draft had been delivered to [the decedent], it was my understanding that the next move was hers; I could not proceed any further with the preparation of the new will until she communicated to me her comments and whether she was satisfied with its provisions. Moreover, [the decedent] told me she intended to confer with her sister . . . , who had a will with provisions similar to those of [the decedent's] 1973 will, before finalizing the provisions of the draft of the proposed new will."

The draft will Locke-Paddon prepared would have directed specific gifts to Radovich and others and would have given the residue of the estate to a charitable remainder trust for the ultimate benefit of the Greater Santa Cruz Unity Foundation and the Lucile Salter Packard Children's Hospital upon the death of Radovich. Specified income payments would have been made to Radovich, as the only income beneficiary, during his lifetime.

Locke-Paddon declares that the decedent "did not communicate with me regarding the draft of the new will prior to her death."

The decedent died on December 19, 1991. She had not executed a new will. Ultimately her 1973 will was admitted to probate.

Thereafter Radovich sued the decedent's sister, the Borina Orchards partnership, a corporation which allegedly had been wholly owned by the decedent and her sister, Locke-Paddon, and the law firm for breach of fiduciary duty and on other related theories, seeking a variety of relief. As subsequently amended, Radovich's complaint in his fiduciary duty action alleged in its fifth count that Locke-Paddon and the law firm had breached fiduciary duties to Radovich in that "they failed to inform [Radovich] of his community property rights; they failed to offer any advice to [Radovich] that his execution of the consent provision of the Borina partnership agreement, a provision which they prepared for his signature, was intended to thwart his

community property rights; and they failed to obtain [Radovich's] consent to their continuing representation of [the decedent, her sister, the corporation, and the partnership], all of whom disputed and continue to dispute [Radovich's] lawful community property rights." The fifth count added allegations to support claims for compensatory and punitive damages against Locke-Paddon and the law firm. In separate counts of the fiduciary duty action Radovich alleged that Locke-Paddon and the law firm had aided and abetted, and had conspired in, violations of duties owed him; these counts were subsequently dismissed and are not before us.

Radovich then brought a separate action for legal malpractice against Locke-Paddon and the law firm, alleging in his complaint that Locke-Paddon, individually and as a representative of the law firm, had been dilatory and negligent in preparing and, ultimately, in "fail[ing] to obtain [the decedent's] due execution of," the 1991 draft will. The complaint in the malpractice action alleged that the decedent's estate had been valued at approximately $10 million.

The two actions were ordered consolidated. Shortly before trial, Locke-Paddon and the law firm moved for summary adjudication that (for purposes of the malpractice action) Locke-Paddon and the law firm owed no duty to Radovich "to draft and have executed in a prompt and diligent manner the proposed new will of [the] decedent . . . ," and that (as to the fifth count of the fiduciary duty action) Radovich's claim for breach of fiduciary duty against Locke-Paddon and the law firm was barred by the applicable statute of limitations, Code of Civil Procedure section 340.6.

The trial court granted summary adjudication as requested. When Radovich elected to dismiss the only other count of the fiduciary duty action then pending against Locke-Paddon and the law firm, the trial court entered judgment for both defendants in the consolidated actions. This appeal followed.

Review of summary judgment or summary adjudication "involves pure matters of law," which we review independently. (*Parsons Manufacturing Corp.* v. *Superior Court* (1984) 156 Cal.App.3d 1151, 1156 [203 Cal.Rptr. 419]; *AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064 [225 Cal.Rptr. 203].)

## 1. *Duty*

The theory of Radovich's malpractice action was that Locke-Paddon had owed a "duty of due care and reasonable diligence" to Radovich, "in

[Radovich's] capacity as the proposed 100% income beneficiary under the 1991 Will, to carry [the decedent's] testamentary wishes into effect in a reasonably prompt and diligent fashion," and that Locke-Paddon, in breach of his duty as so defined, had failed to obtain the decedent's "due execution of a final draft of the 1991 Will prior to her death . . . ."

The essence of this theory was that Locke-Paddon had been guilty of *professional negligence*: that he had owed Radovich a duty to use such skill, prudence, and diligence as other attorneys commonly possess and exercise, that he had breached that duty, and that his breach had caused injury to Radovich. (Cf. *Budd* v. *Nixen* (1971) 6 Cal.3d 195, 200 [98 Cal.Rptr. 849, 491 P.2d 433]; *McDaniel* v. *Gile* (1991) 230 Cal.App.3d 363, 375 [281 Cal.Rptr. 242].)

Radovich asserts that Locke-Paddon, with knowledge of the decedent's life-threatening illness, fell short of the professional standard of skill, prudence, and diligence in three specific respects: by permitting three and one-half months to elapse before delivering a draft will to the decedent, by preparing the draft in a "professionally incompetent" manner, and by making no effort, in the slightly more than two months between delivery of the draft and the decedent's death, to remind the decedent of what she needed to do to execute the will or even to find out whether she wished to execute it.

The question whether Locke-Paddon's performance did indeed fail to meet the professional standard of care is not before us. Nor is the question whether (if so) the described lack of care would expose Locke-Paddon and his law firm to liability to the decedent (who was their client for this purpose) or to the decedent's estate. The narrow question framed for the trial court, and for us on independent review, is whether (assuming Locke-Paddon had failed to meet the standard of care) Locke-Paddon and his firm would be liable to *Radovich*: whether Locke-Paddon's *duty* to use professional skill, prudence, and diligence extended beyond his client to an individual who would have benefitted had Locke-Paddon's client executed a will consistent with the draft he submitted to her but which she never signed. If Locke-Paddon owed no such duty *to Radovich*, then Radovich could not recover from Locke-Paddon or the law firm for the asserted breach of the duty.

■ Duty, in the context of negligence analysis, has been said to be " 'a shorthand statement of a conclusion, rather than an aid to analysis in itself. . . . "[D]uty" is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' " (*Dillon* v. *Legg* (1968) 68

Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], quoting from Prosser, Law of Torts (3d ed. 1964) § 53, pp. 332-333; cf. *Bily* v. *Arthur Young & Co.* (1992) 3 Cal.4th 370, 397 [11 Cal.Rptr.2d 51, 834 P.2d 745].) " 'Courts . . . have invoked the concept of duty to limit generally "the otherwise potentially infinite liability which would follow from every negligent act . . . ." ' " (*Bily* v. *Arthur Young & Co.*, *supra*, 3 Cal.4th at p. 397, quoting from *Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741, 750 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701].)

█ In cases of assertedly negligent infliction of physical injury or illness, it has sometimes been deemed sufficient to limit liability simply in terms of foreseeability: to subject the defendant to liability for only such injuries to others as "to the defendant at the time were reasonably foreseeable." (*Dillon* v. *Legg*, *supra*, 68 Cal.2d at p. 739; cf. Rabin, *Tort Recovery for Negligently Inflicted Economic Loss: A Reassessment* (1985) 37 Stan.L.Rev. 1513, 1526, quoted in *Thing* v. *La Chusa* (1989) 48 Cal.3d 644, 663 [257 Cal.Rptr. 865, 771 P.2d 814] [foreseeability " 'may set tolerable limits for most types of physical harm' "].) But increasingly in recent years our courts have recognized that a foreseeability limitation may not by itself be a sufficient safeguard against "potentially infinite liability" in cases of assertedly negligent infliction of various kinds of nonphysical harm. In such cases the courts have studied on a case-by-case basis the policy considerations which might or might not justify a finding of a pertinent duty. (Cf., e.g., *Bily* v. *Arthur Young & Co.*, *supra*, 3 Cal.4th at pp. 397-407 [scope of auditor's duty of care in performing audit]; *Thing* v. *La Chusa*, *supra*, 48 Cal.3d at pp. 663-664 [infliction of emotional distress on absent relative]; *Nally* v. *Grace Community Church* (1988) 47 Cal.3d 278, 300 [253 Cal.Rptr. 97, 763 P.2d 948] [scope of clergyman-counselor's liability to parents of suicide victim]; *Elden* v. *Sheldon* (1988) 46 Cal.3d 267, 273-277 [250 Cal.Rptr. 254, 758 P.2d 582] [emotional distress at witnessing injury to unmarried cohabitant].)

█ The narrow question whether attorneys in the position of Locke-Paddon and the law firm should owe a duty of care to potential beneficiaries such as Radovich in circumstances such as those of this case apparently has not yet been directly answered in a reported California decision.

Radovich asserts that a conclusion that Locke-Paddon owed him a duty of care is supported by the predictions of California text writers as well as by policy considerations enumerated in broadly analogous California cases.

The text writers Radovich quotes (all of whom published their remarks in California Continuing Education of the Bar estate planning materials) all

counsel estate-planning attorneys, on pain of personal liability, to exercise diligence and skill. To emphasize their points the writers mention the "significant . . . risk of being sued by someone who is not a client" (Brennan, *Challenges, Risks, and Malpractice Avoidance for the Estate Planning Attorney* (Cont.Ed.Bar 1991) 12 Estate Planning & Cal. Probate Rptr. p. 131), suggest that "[a] will file that is open at the client's death is an invitation to a law suit" (1 Cal. Will Drafting (Cont.Ed.Bar 1993) § 1.6, p. 1-9), and more specifically warn that "if the plaintiff can show that he or she was intended to be the testator's beneficiary, that the testator gave appropriate instructions to the attorney drafter, and that the attorney unreasonably delayed in preparation of the estate plan, no compelling public policy reason exists for refusing to find the attorney liable in negligence." (Estate Planning (Cont.Ed.Bar 1992) § 2.25, pp. 82-83.) These writers are to be commended for undertaking to make vivid the unquestionable need for high standards of professional performance; the importance of sending such a message is a legitimate policy consideration which we shall weigh. But of course the writers' comments purport only to predict, and cannot authoritatively establish, what the law will be.

Radovich relies primarily on five cases, all of which cast light upon but none of which clearly resolves the issue here.

In *Donald* v. *Garry* (1971) 19 Cal.App.3d 769, 772 [97 Cal.Rptr. 191, 45 A.L.R.3d 1177], a creditor assigned his claim to a collection agency, whose attorney filed an action on the claim but then suffered the action to be dismissed for lack of diligent prosecution. The Court of Appeal ultimately concluded that the attorney's duty of care had extended to the creditor; it deemed its conclusion supported by a need to avoid procrastination in professional services which would be frustrated by permitting the attorney to avoid liability to the creditor whose claim he had been retained to collect simply because he had been retained for that purpose by an intermediary.

In *Roberts* v. *Ball, Hunt, Hart, Brown & Baerwitz* (1976) 57 Cal.App.3d 104, 110-111 [128 Cal.Rptr. 901], a pleading case, the plaintiff alleged that defendant attorneys had undertaken, "on behalf of their clients, to assist in securing loans from various persons, including plaintiff, for the benefit of [the clients]," that the attorneys, without fraudulent intent, had prepared for their clients a misleading letter concerning the status of their clients' partnership, that the attorneys knew the letter would be shown to the plaintiff and intended it to influence the plaintiff's conduct, and that harm to the plaintiff was foreseeable. The Court of Appeal had "no difficulty" in concluding that these allegations stated a claim for negligent misrepresentation against the attorneys. (57 Cal.App.3d at p. 111.)

Radovich's three remaining cases are factually closer to this one, and are well known for their development of the modern law of the duty of care owed by a party performing a contract to a plaintiff who is *not* a party to the contract and in this sense is not "in privity with" the contracting party.

In *Biakanja* v. *Irving* (1958) 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358], the plaintiff's brother had died after signing a will, prepared by a notary public, which purported to leave all the decedent's property to the plaintiff. The notary had negligently failed to have the will properly attested; the will was denied probate, and the plaintiff received only one-eighth of the estate. She sued the notary and recovered a judgment. The Supreme Court affirmed the judgment, noting that historically liability to third persons (i.e., "in the absence of privity") for negligent performance of contractual covenants had been fairly strictly limited, but perceiving a trend away from the strict limitations and concluding "that plaintiff should be allowed recovery despite the absence of privity." (49 Cal.2d at p. 651.) *Biakanja* set down principles which have been often quoted and recently revalidated: ▉ "The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm. [Citations.]" (49 Cal.2d at p. 650; cf. *Bily* v. *Arthur Young & Co.*, *supra*, 3 Cal.4th at pp. 397-398.) ▉ The Supreme Court noted that the passing of the brother's estate to the plaintiff had been the " 'end and aim' " of the notary's undertaking to prepare the brother's will, and was also impressed by the foreseeability of the harm to the plaintiff, by the direct causal relationship between the notary's negligence and the harm to the plaintiff, and by the need to discourage unqualified and unauthorized practice of law: "Such conduct should be discouraged and not protected by immunity from civil liability, as would be the case if plaintiff, the only person who suffered a loss, were denied a right of action." (49 Cal.2d at p. 651.)

In *Lucas* v. *Hamm* (1961) 56 Cal.2d 583 [15 Cal.Rptr. 821, 364 P.2d 685], a pleading case, the Supreme Court, in dictum, indicated that the *Biakanja* principles would extend to an *attorney* who, in violation of the testator's instructions and in breach of his contract with the testator, negligently inserted invalid phraseology in the will the testator signed, with the result that following the testator's death the plaintiff's share of the estate was substantially less than the testator had apparently intended. The Supreme

Court perceived that many of the *Biakanja* factors "are equally applicable here. As in *Biakanja*, one of the main purposes which the transaction between defendant and the testator intended to accomplish was to provide for the transfer of property to plaintiffs; the damage to plaintiffs in the event of invalidity of the bequest was clearly foreseeable; it became certain, upon the death of the testator without change of the will, that plaintiffs would have received the intended benefits but for the asserted negligence of defendant; and if persons such as plaintiffs are not permitted to recover for the loss resulting from negligence of the draftsman, no one would be able to do so and the policy of preventing future harm would be impaired." (56 Cal.2d at pp. 588-589.) The Supreme Court concluded that recognition of liability would not unduly burden the legal profession, that although there was no element of unauthorized practice of law that element had been "only a minor factor" in the *Biakanja* decision, and, in sum, that lack of privity would not preclude a tort action by the plaintiff against the attorney. (56 Cal.2d at pp. 588-589.) The Supreme Court went on, still in dictum, to suggest that the plaintiff could also recover as a third party beneficiary of the contract between the attorney and the testator.

In *Heyer* v. *Flaig* (1969) 70 Cal.2d 223 [74 Cal.Rptr. 225, 449 P.2d 161], also a pleading case, it was alleged that the decedent had retained the defendant attorney to prepare a will leaving everything to the plaintiffs, that she had told the attorney that she planned to marry, that the attorney negligently omitted from the will language which would defeat the rights of the posttestamentary spouse, that the decedent executed the will, married, and subsequently died, and that as result of the attorney's omission the plaintiffs' share of the estate was substantially reduced by the claim of the posttestamentary spouse. On appeal after demurrer sustained, the dispositive issue was the date on which the statute of limitations would have begun to run against the plaintiffs, but preliminarily the Supreme Court reviewed the principles stated in *Biakanja* and *Lucas*. The court stated that the theory of *tort* liability to the intended beneficiary, "for a breach of duty owed directly to him," lay "[a]t the heart of our decision in *Lucas* . . . ," and that *Lucas*'s third party beneficiary contract theory "is conceptually superfluous since the crux of the action must lie in tort in any case; there can be no recovery without negligence." (70 Cal.2d at pp. 226, 227.) *Heyer* strongly reinforced the theory that an attorney who "undertakes to fulfill the testamentary instructions of his client . . . realistically and in fact assumes a relationship . . . also with the client's intended beneficiaries," that "the possibility of injury to an intended beneficiary" is foreseeable should the client's testamentary plan fail after his or her death, and that in such an eventuality "only the beneficiaries suffer the real loss. We recognized in *Lucas* that unless the beneficiary could recover against the attorney in such a case, no one could

do so and the social policy of preventing future harm would be frustrated. [¶] . . . . We impose this duty because of the relationship between the attorney and the intended beneficiary; public policy requires that the attorney exercise his position of trust and superior knowledge responsibly ·so as not to affect adversely persons whose rights and interests are certain and foreseeable." (*Id.* at pp. 228-229.)

The case before us differs from *Biakanja*, *Lucas* and *Heyer* in one significant respect: the decedent never signed the will Locke-Paddon drafted. While the crux of *Biakanja*, *Lucas* and *Heyer* was that a will the decedent *had signed* had been rendered wholly or partially ineffective, at least as to the beneficiaries, by the negligence of the person who had prepared the will, the crux of Radovich's claim is that a will potentially beneficial to him had never become effective because, assertedly due to Locke-Paddon's negligence, the decedent *had not signed* it.

Although we are aware of no California case that has addressed the issue before us, Locke-Paddon and the law firm have called our attention to recent decisions in Connecticut and in Pennsylvania in cases factually similar to ours.

In *Krawczyk* v. *Stingle* (1988) 208 Conn. 239 [543 A.2d 733], the decedent had met, some 10 days before he died, with the defendant attorney and had informed her that he was soon to undergo open heart surgery and wanted to arrange for disposition of his estate. The decedent had directed the attorney to prepare two trust documents which were intended to benefit the plaintiffs and at the same time to avoid probate. Through a series of circumstances completion of the documents was delayed; by the time the attorney completed the documents the decedent was too ill to see her and he died without having signed the documents. The plaintiffs' theory of negligence liability against the attorney was that she should have acted more decisively to obtain the decedent's signatures on these or equivalent documents once she had been advised, approximately 24 hours before he died, that the decedent had suffered a heart attack and was gravely ill. The plaintiffs recovered a judgment against the attorney and her law firm. On appeal the defendants argued, among other things, that their motions for directed verdict and for judgment notwithstanding the verdict should have been granted because under the circumstances the attorney and her law firm did not have a *duty* to the plaintiffs.

The Connecticut Supreme Court agreed with this argument, and reversed the judgment with directions to enter judgment for the defendants. The court acknowledged the holdings of *Lucas*, and of similar cases from Connecticut

and other jurisdictions; it stated that "[t]he question before us is whether such liability should be further expanded to encompass negligent delay in completing and furnishing estate planning documents for execution by the client." (208 Conn. at p. 245 [543 A.2d at p. 734].) It suggested that "[d]etermining when attorneys should be held liable to parties with whom they are not in privity is a question of public policy," and concluded "that the imposition of liability to third parties for negligent delay in the execution of estate planning documents would not comport with a lawyer's duty of undivided loyalty to the client. [¶] A central dimension of the attorney-client relationship is the attorney's duty of '[e]ntire devotion to the interest of the client.' [Citations.] This obligation would be undermined were an attorney to be held liable to third parties if, due to the attorney's delay, the testator did not have an opportunity to execute estate planning documents prior to death. Imposition of liability would create an incentive for an attorney to exert pressure on a client to complete and execute estate planning documents summarily. Fear of liability to potential third party beneficiaries would contravene the attorney's primary responsibility to ensure that the proposed estate plan effectuates the client's wishes and that the client understands the available options and the legal and practical implications of whatever course of action is ultimately chosen. These potential conflicts of interest are especially significant in the context of the final disposition of a client's estate, where the testator's testamentary capacity and the absence of undue influence are often central issues. [Citation.]" (*Id.* at pp. 245-247 [543 A.2d at p. 736].) The court found illustration of "the serious potential for conflicts of interest inherent in such situations" in the facts before it; in the court's view, "[p]rophylactic principles of public policy counsel against rules of liability that promote such conflicts of interest." (*Id.* at p. 247 [543 A.2d at p. 736].)

In *Gregg* v. *Lindsay* (1994) 437 Pa.Super. 206 [649 A.2d 935], Gregg, a longtime friend of the decedent's, had visited the decedent in a hospital intensive care unit where the decedent was confined after surgery. According to Gregg the decedent directed him to contact the decedent's attorney and have the attorney prepare a new will for the decedent which would make substantial provisions for Gregg. Gregg so advised the attorney (who had prepared the decedent's then current will which made no provision for Gregg) and also told the attorney that the decedent was in serious condition and that the will should be drafted and executed the same day or Gregg would find another attorney to do the job. The attorney drafted the will and took it to the decedent that evening; the decedent seemed unconcerned but said the revised will was acceptable. The attorney found the situation unusual and recommended that two subscribing witnesses be found. When he could not find subscribing witnesses at the hospital, the attorney proposed

to return in the morning and, in the interim, to make a correction in the will. The decedent made no objection. But by the time the attorney returned, shortly after noon the following day, the decedent had been transferred to another hospital where he died, later that day, without having signed the will.

Gregg obtained a judgment against the attorney. The Superior Court of Pennsylvania reversed the judgment. Under Pennsylvania law Gregg could not have pursued a negligence theory against the attorney because he had not been the attorney's client; he was constrained to proceed instead on the theory that he had been the third party beneficiary of a contract between the attorney and the decedent. The superior court noted that in this case "there was no executed will which . . . could clearly establish an intent by the testator to benefit the third person. Where one seeks to prove the existence of an oral contract for the making of a will, he assumes an exacting evidentiary burden which requires clear, direct and precise evidence of each of the elements to a valid contract." (649 A.2d at p. 940.) After review of the circumstances of the case before it the superior court concluded that "[t]his is nothing more than a case in which the testator died before he had executed a new will. His death did not confer upon a disappointed beneficiary a cause of action against the lawyer who drafted the will and who, with the testator's consent, deferred execution of the will until the following day." (*Ibid.*) In the course of its discussion the superior court quoted with approval the Connecticut Supreme Court's discussion of the attorney-client relationship, in *Krawczyk*, which we have quoted above.

Radovich takes the position that on their particular facts both *Krawczyk* and *Gregg* were correctly decided, but that both cases should be limited to their facts and should be distinguished from this case. Radovich argues in policy terms that even a situation as "extreme" as that in *Krawczyk* "does not justify a general rule that an attorney can never be liable for his negligence when a decedent dies without executing a will. The *Krawczyk* general rule is much broader than necessary, harmful to the pursuit of healthy legal ethics, and unnecessarily protective of negligent conduct by lawyers. [¶] . . . The client has asked his lawyer to put his testamentary wishes in a form which will accomplish his goals; to allow the lawyer to unreasonably and negligently delay that task without liability or responsibility would be to undermine loyalty to a client, not to enhance it." Thus Radovich in essence argues that a duty *to a disappointed beneficiary* should be found for the policy purpose of encouraging estate planning attorneys to meet an appropriate standard of care: "What we are asking is that pressure be put on the attorney to act ethically and responsibly . . . ." Radovich submits that such pressure may properly take the form of a judicially recognized duty *to potential beneficiaries* to meet this obviously desirable standard of care.

Locke-Paddon and the law firm suggest that such a rule would be unworkable in, for example, the hypothetical situation of a decedent who left four unexecuted draft wills each of which would have made a different testamentary disposition. Radovich responds that his rule should apply only where intent to benefit a particular beneficiary can be clearly established: he "argues for liability only when the . . . breaches of duty and frustrations of testamentary intent presented by the likes of this case are present."

Radovich argues that "every one" of the *Biakanja* policy factors, and particularly each of those on which the Supreme Court in *Lucas* relied, supports his position here.

Radovich also appears to suggest that the fact Locke-Paddon and the law firm had from time to time represented *him* in other matters should somehow strengthen his argument that the attorneys' duty of care with respect to the decedent's draft will should extend to Radovich in the circumstances of record. We find this suggestion, as we understand it, unpersuasive: with respect to this particular transaction (cf. *Brandlin* v. *Belcher* (1977) 67 Cal.App.3d 997, 1001 [134 Cal.Rptr. 1]) it is clear that Locke-Paddon and the law firm were acting solely as the decedent's attorneys and not as Radovich's.

Locke-Paddon and the law firm rely primarily on the Connecticut Supreme Court's analysis in *Krawczyk*, as quoted with approval in *Gregg*, arguing that the policy predicates for the *Krawczyk* decision are as compelling under California law as they were in Connecticut. They point out that our own Supreme Court has recently reaffirmed the fundamental importance of an attorney's duty of undivided loyalty to his or her client. (*Flatt* v. *Superior Court* (1994) 9 Cal.4th 275, 289 [36 Cal.Rptr.2d 537, 885 P.2d 950]; cf. *Anderson* v. *Eaton* (1930) 211 Cal. 113, 116 [293 P. 788].) They also analyze each of the *Biakanja/Lucas* factors, and conclude that *Lucas* does not support "a rule of law encouraging attorneys to rush their clients into making [a testamentary] decision before they may be ready . . . ," and that such a rule "would be against public policy."

As we undertake to weigh the various policy factors the parties have identified, we note preliminarily that Radovich's repeated references to perceived shortcomings in Locke-Paddon's draftsmanship do not appear to advance his argument. Had the decedent signed the will, and had it developed after her death that errors in draftsmanship had vitiated the decedent's apparent testamentary intent, then we would have an analog to *Lucas* and to *Heyer*. But on its face the draft will is faulty only in cosmetic particulars; Radovich suggests no respect in which the draft, if the decedent had signed

it, would have been ineffective to achieve the disposition of assets Radovich would have preferred. Nor does Radovich appear to suggest that it was perceived faults in the draftsmanship of the document which led the decedent not to sign it in the slightly more than two months before her death. We take the pertinent focus of Radovich's argument to be not on the quality of the draft Locke-Paddon prepared but rather on his delay in preparing it and on his asserted failure to encourage the decedent to take action on it once it was prepared.

Neither *Donald* v. *Garry* nor *Roberts* v. *Ball, Hunt, Hart, Brown & Baerwitz* is directly helpful to our analysis. In each the result was made explicable by special circumstances not present in the case before us: in *Donald* the sole purpose for which the attorney had been retained (albeit through an intermediary) was to collect the plaintiff's claim; in *Roberts*, which involved the unique elements of California's statutory tort of deceit by negligent misrepresentation (Civ. Code, §§ 1709, 1710), the attorneys were alleged to have affirmatively intended their letter to be used to influence the plaintiff's conduct. *Donald* did implicitly recognize the consideration, to which we shall return, that it may be undesirable as a policy matter to permit a negligent attorney wholly to escape liability to anyone.

Most of the *Biakanja* factors by no means as clearly militate in favor of a finding of duty here as in *Lucas*, *Heyer*, or *Biakanja* itself.

The "extent to which the transaction was intended to affect" Radovich depends to some extent on one's perception of the nature of the transaction.

Radovich characterizes the June meeting between the decedent and Locke-Paddon as a significant commitment to a particular testamentary disposition, analogous to the decedent's signature on purportedly valid and effective testamentary documents (which thereafter remained unchanged until the decedent's death) in *Biakanja*, *Lucas*, and *Heyer*.

We are not persuaded by Radovich's characterization. From Radovich's perspective this is not as strong a case for an inference of commitment to the potential beneficiary, and thus, ultimately, for a finding of duty to that potential beneficiary, as either *Krawczyk* or *Gregg*.

In each of those cases the circumstances suggested that the decedent foresaw a possibility of death within a very short time—within days or even hours—and it may be inferred that the decedent understood that he would need to make and implement a decision without assurance that he would have an opportunity to change his mind.

The situation of the decedent in this case was significantly different: although she was aware of her cancer and, inferably, of its lethal potential, no one suggests that in June 1991 she believed her death was so imminent as to be likely to deny her an opportunity to give further thought to her testamentary plan after the will was drafted. Indeed she expressed an intention to discuss the draft with her sister, and it may be inferred that the decedent could reasonably have expected the sister to try to change her mind.

In this case, even more clearly than in *Krawczyk* or in *Gregg*, we see both practical and policy reasons for requiring more evidence of commitment than is furnished by a direction to prepare a will containing specified provisions. From a practical standpoint, common experience teaches that potential testators may change their minds more than once after the first meeting. Although a potential testator may also change his or her mind *after* a will is signed, we perceive significantly stronger support for an inference of commitment in a signature on testamentary documents than in a preliminary direction to prepare such documents for signature. From a policy standpoint, we must be sensitive to the potential for misunderstanding and the difficulties of proof inherent in the fact that disputes such as these will not arise until the decedent—the only person who can say what he or she intended—has died. Thus we must as a policy matter insist on the clearest manifestation of commitment the circumstances will permit.

We conclude that in all the circumstances of record (including the circumstance that the decedent, given two months to sign the will, did not do so), the June meeting and preparation of the October will draft were insufficient in and of themselves to manifest a commitment by the decedent to benefit Radovich.

By the same token, the "foreseeability of harm" to Radovich, the degree of certainty that he "suffered injury" attributable to Locke-Paddon's conduct, and the "closeness of the connection" between Locke-Paddon's conduct and the injury Radovich assertedly suffered are all significantly less in this case than they would have been in a case, such as *Biakanja*, *Lucas*, or *Heyer*, in which a new testamentary document had been signed by the decedent before she died.

On the other hand, the asserted deficiencies in Locke-Paddon's performance, if proven, would warrant significant "moral blame" and arguably should in some manner be sanctioned as a deterrent to "future harm" in similar circumstances. The strongest argument for Radovich's position, as he appears in his arguments to this court to recognize, is that if the duty of care

of Locke-Paddon and the law firm is *not* extended to Radovich, in the circumstances of record Locke-Paddon and the law firm will be liable to no one and an opportunity to deter such conduct in future will be lost. Similar arguments were given substantial if not dispositive weight in *Biakanja*, *Lucas*, *Heyer*, and *Donald*, and the psychology of deterrence by potential liability was the apparent predicate for the continuing education texts from which Radovich has quoted.

But obviously the notion that liability can legitimately be imposed to deter carelessness cannot be applied arbitrarily or in a vacuum. Just as it would not do to award damages to a randomly selected bystander simply to bring home a message that the defendant and others like him or her should not be careless, so it would not do to make such an award, even to a rationally selected plaintiff, if in the circumstances the objective of deterrence is outweighed by countervailing policy considerations.

Countervailing policy considerations are present in this case.

We agree with *Krawczyk* that imposition of liability in a case such as this could improperly compromise an attorney's primary duty of undivided loyalty to his or her client, the decedent. In a sense this is factually a stronger case for the point than was *Krawczyk*: here, notwithstanding his inexplicable delay in preparing the draft will in the first place, Locke-Paddon did get the draft to the decedent more than two months before she died. Thus here the decedent, unlike the decedent in *Krawczyk*, did have an opportunity to execute the testamentary document before death. Further, the undisputed facts make plain that it was the decedent's intent to give further thought to her testamentary plan and to consult with her sister. Even more clearly here than in *Krawczyk*, "[i]mposition of liability would create an incentive for an attorney to exert pressure on a client to complete and execute estate planning documents summarily," without the additional consideration the decedent in this case said she intended to give them, and "[f]ear of liability to potential third party beneficiaries would contravene the attorney's primary responsibility to ensure that the proposed estate plan effectuates the client's wishes and that the client understands the available options and the legal and practical implications of whatever course of action is ultimately chosen." (*Krawczyk* v. *Stingle*, *supra*, 208 Conn. at pp. 246-247 [543 A.2d at p. 736].)

We acknowledge that in the circumstances it would have been professionally appropriate, at least, for Locke-Paddon to have inquired of the decedent whether she had any question or wished further assistance in completing the change of testamentary disposition she had discussed with him. But on weighing relevant policy considerations we conclude that Locke-Paddon and the law firm cannot be held to have owed a duty to *Radovich* to have done so.

Our analysis should make clear that, consistent with our perception of the common law method, we have restricted our consideration, and thus necessarily the conclusion we have reached, to the circumstances of record before us. We hold only that for purposes of summary adjudication the record sufficiently establishes that Locke-Paddon and the law firm owed no duty to Radovich.

## 2. *Statute of Limitations*

■ The parties agree that the statute of limitations applicable to the fifth count of Radovich's fiduciary duty action is Code of Civil Procedure section 340.6, which provides in pertinent part that "[a]n action against an attorney for a wrongful act or omission, other than for actual fraud, arising in the performance of professional services shall be commenced within one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the facts constituting the wrongful act or omission, or four years from the date of the wrongful act or omission, whichever occurs first," subject to four enumerated tolling provisions. (Code Civ. Proc., § 340.6, subd. (a); cf. *Stoll* v. *Superior Court* (1992) 9 Cal.App.4th 1362, 1363-1364 [12 Cal.Rptr.2d 354].) Of the four, Radovich invokes only the provision that "[i]n no event shall the time for commencement of legal action exceed four years except that the period shall be tolled during the time that . . . [¶] . . . The plaintiff has not sustained actual injury . . . ." (Code Civ. Proc., § 340.6, subd. (a)(1).)

Radovich concedes that the asserted breaches of fiduciary duty alleged in his fifth count occurred more than four years before he filed his action. He argues, however, that the record does not show as matters of undisputed fact that he *discovered* the facts pertinent to his cause of action, or that he sustained *actual injury*, until the time of decedent's death less than a year before he filed his fiduciary duty action. Radovich argues that for purposes of summary adjudication the record does not negate his assertion that the limitation period was tolled until the decedent's death.

### a. *Discovery*

On its face Code of Civil Procedure section 340.6 states two distinct and alternative limitation periods: *one* year after actual or constructive *discovery*, or *four* years after *occurrence* (the date of the wrongful act or omission), whichever occurs first.

Before Code of Civil Procedure section 340.6 took effect in 1978, most legal malpractice actions had been held subject to the two-year statute of

limitations applicable, under Code of Civil Procedure section 339, subdivision 1, to "[a]n action upon a contract, obligation or liability not founded upon an instrument in writing . . . ." Until 1971 this was regarded as an *occurrence* statute: "[T]he statute of limitations commenced to run when the facts constituting the cause of action *occurred*, no matter when these facts are discovered by the client." (Mallen, *Panacea or Pandora's Box? A Statute of Limitations for Lawyers* (1977) 52 State Bar J. 22, 23, italics added; cf. *Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 179, 183-186 [98 Cal.Rptr. 837, 491 P.2d 421] (*Neel*).)

In 1971 the Supreme Court held that as applied to legal malpractice Code of Civil Procedure section 339 should, in fairness to the client and in recognition of the fiduciary character of the attorney-client relationship, be a *discovery* statute: "[T]he statute of limitations for legal malpractice, as for all professional malpractice, should be tolled until the client *discovers*, or should discover, his cause of action." (*Neel, supra*, 6 Cal.3d at p. 179, italics added; cf. *id.* at p. 194.) The Supreme Court recognized "that the instant ruling will impose an increased burden upon the legal profession," in that "[a]n attorney's error may not work damage or achieve discovery for many years after the act, and the extension of liability into the future poses a disturbing prospect," and acknowledged "the possible desirability of the imposition of some outer limit upon the delayed accrual of actions for legal malpractice." (*Id.* at p. 192.) In 1971 the special statute of limitations for *medical* malpractice and related actions, Code of Civil Procedure section 340.5, was "four years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever first occurs." (Stats. 1970, ch. 360, § 1, p. 772; the statute was rewritten in 1975.) Thus section 340.5, as it then read, provided for both a form of occurrence limitation period and a discovery period, in the alternative. The Supreme Court suggested that "[a] similar, but possibly longer, absolute limit may be desirable in actions for legal malpractice [citations], or indeed in all actions for professional malpractice." (*Neel*, 6 Cal.3d at pp. 192-193, fn. omitted.)

In 1977 the Legislature enacted Code of Civil Procedure section 340.6, effective January 1, 1978, which followed the example of section 340.5 by providing for both a four-year *occurrence* period and a one-year *discovery* period, in the alternative. Manifestly the Legislature's intent was to impose (subject to several tolling provisions) the "longer, absolute limit" *Neel* had suggested. (Cf. *Baright* v. *Willis* (1984) 151 Cal.App.3d 303, 308 [198 Cal.Rptr. 510]; *Krusesky* v. *Baugh* (1982) 138 Cal.App.3d 562, 566 [188 Cal.Rptr. 57]; *Rubinstein* v. *Barnes* (1987) 195 Cal.App.3d 276, 281-283 [240 Cal.Rptr. 535]; Mallen, *An Examination of a Statute of Limitations for Lawyers* (1978) 53 State Bar J. 166; 3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 445, pp. 476-477.)

Given Radovich's concession that the asserted breaches of fiduciary duty occurred more than four years before he filed his action[1] (and assuming the limitation periods were not tolled), on its face Code of Civil Procedure section 340.6 would have barred Radovich's action by virtue of its four-year *occurrence* period—"four years from the date of the wrongful act or omission"—even if (as he asserts) Radovich did not *discover* the relevant facts until less than one year before he filed.

Radovich argues, to the contrary, that even the four-year period would not have begun to run until he was aware of the relevant facts.

Radovich's argument contradicts the plain language of Code of Civil Procedure section 340.6 and, if validated, would frustrate the manifest intent of the Legislature to place an outside time limitation (subject to tolling) on claims for legal malpractice.

To support his position Radovich relies on language from the Supreme Court's recent decisions in *ITT Small Business Finance Corp.* v. *Niles* (1994) 9 Cal.4th 245 [36 Cal.Rptr.2d 552, 885 P.2d 965] (*ITT*) and *Laird* v. *Blacker* (1992) 2 Cal.4th 606, 611 [7 Cal.Rptr.2d 550, 828 P.2d 691], from this court's decision in *Finlayson* v. *Sanbrook* (1992) 10 Cal.App.4th 1436 [13 Cal.Rptr.2d 406], and from opinions in cases which analyze other statutes of limitations.

In *ITT* the "narrow issue" before the Supreme Court was whether, in specified circumstances, "ITT suffered 'actual injury' under the *one-year* statute of limitations for attorney malpractice actions (Code Civ. Proc., § 340.6 . . .) . . . ." (*ITT, supra*, 9 Cal.4th at p. 248, italics added.) It was in this context that the Supreme Court said that "[s]ection 340.6 provides that legal malpractice actions shall commence running when the client discovers or should have discovered the facts constituting the malpractice . . . ." (9 Cal.4th at p. 248), that "[u]nder section 340.6, a malpractice action accrues once a former client 'discovers' the malpractice . . ." (*id.* at p. 250), that "[s]ection 340.6 provides that . . . knowledge . . . must be present before a cause of action for legal malpractice will accrue" (*id.* at p. 257), and that "a cause of action for legal malpractice accrues under section 340.6(a) when the former client 'discovers' the malpractice *and* is 'actually harmed by it . . . .'" (*Id.* at p. 258.) We are satisfied that the Supreme Court

---

[1]Code of Civil Procedure section 340.6 has been held to operate prospectively only. (*Krusesky* v. *Baugh, supra*, 138 Cal.App.3d at pp. 566-567.) As a practical matter this means, in the circumstances of this case, that the four-year *occurrence* statute could not have commenced until January 1, 1978, for wrongful acts or omissions which occurred before that date. Any period so postponed would have expired on January 1, 1982, nearly 10 years before Radovich filed his fiduciary duty action.

intended each of these references to apply only to the one-year *discovery* period to which its review was narrowly directed.

In *Laird*, as well, the focus was on the meaning of "actual injury" for purposes of the one-year discovery statute. (*Laird* v. *Blacker, supra*, 2 Cal.4th at p. 609.) In a context similar in this respect to that of *ITT*, the Supreme Court said that "[s]ection 340.6 provides that the statute of limitations for legal malpractice commences when the client discovers, or should have discovered, the cause of action" (*Ibid.*), that when it adopted Code of Civil Procedure section 340.6 the Legislature "codified the discovery rule of *Neel . . .*" (2 Cal.4th at p. 611), and that "the focus of section 340.6 is on *discovery* of the malpractice and actual injury . . . ." (2 Cal.4th at p. 614.) Again we are satisfied that the Supreme Court intended to address only the one-year discovery period, and not the four-year occurrence period, which was not before it.

In *Finlayson* the issue before this court was whether the statute of limitations on a claim for attorney malpractice, based on an assertion that the attorney had missed the statute of limitations in an underlying action, should run from the date on which the statute was missed or from the later date on which defense summary judgments were entered *because* the statute had been missed. (*Finlayson* v. *Sanbrook, supra*, 10 Cal.App.4th at p. 1438.) In reaching a conclusion that the malpractice statute should run from the date on which the statute in the underlying action was missed,[2] this court said among other things that "there can be no doubt the Legislature intended to commence the statute upon *discovery* of the fact of damage rather than upon final confirmation of the amount of damage." (10 Cal.App.4th at p. 1442, italics added.) This oblique reference was by no means intended to effect a judicial revision of the plain language of Code of Civil Procedure section 340.6 with respect to the four-year occurrence statute, the effect of which as an "outside limit" this court explicitly and accurately restated in a footnote. (10 Cal.App.4th at p. 1442, fn. 6.)

Radovich also quotes from the Supreme Court's recent discussion of the statute of limitations applicable to defamation (Code Civ. Proc., § 340, subd. (3)), in which the court referred to "the common law 'discovery rule,' which provides that the accrual date may be 'delayed until the plaintiff is aware of her injury and its negligent cause.' [Citation.]" (*Bernson* v. *Browning-Ferris*

---

[2]Contra *Pleasant* v. *Celli* (1993) 18 Cal.App.4th 841, 850 [22 Cal.Rptr.2d 663]. Review was denied in both *Finlayson* and *Pleasant*, but the issue is now before the Supreme Court in *Adams* v. *Paul* (Cal.App.), review granted September 29, 1994 (S041623), *McElroy* v. *Biddison* (1995) 36 Cal.App.4th 1488, 1498 [38 Cal.Rptr.2d 804], review granted May 18, 1995 (S045903), and *Moss* v. *Mavridis & Associates* (Apr. 6, 1994) B063743 (nonpub. opn.) review granted June 23, 1994 (S039876).

*Industries* (1994) 7 Cal.4th 926, 931 [30 Cal.Rptr.2d 440, 873 P.2d 613].) And Radovich cites other cases that deal with discovery requirements in contexts other than that of section 340.6. These analyses of other statutes are not pertinent to section 340.6. It is apparent that in section 340.6 the Legislature has chosen to abrogate the common law rule and to enact a special rule for actions against attorneys for wrongful acts or omissions.

We have found no case in which a discovery proviso has been directly and unambiguously attributed to the four-year limitation period of Code of Civil Procedure section 340.6. Nor has Radovich given us any other basis on which we might judicially countermand the Legislature's clear direction that the four-year period is indeed an *occurrence* period which will run whether or not the plaintiff has discovered the malpractice.

    b. *Actual Injury*

■ Code of Civil Procedure section 340.6's provision that "the period shall be tolled during the time that . . . [¶] . . . [t]he plaintiff has not sustained actual injury . . ." applies to both the one-year discovery period and the four-year occurrence period. (*Gurkewitz* v. *Haberman* (1982) 137 Cal.App.3d 328, 336 [187 Cal.Rptr. 14].) Thus in practical effect neither period will begin to run until the plaintiff *has* sustained actual injury. (Cf. *Finlayson* v. *Sanbrook, supra*, 10 Cal.App.4th at p. 1438.) ■ Radovich's assertion that he neither discovered the pertinent facts nor sustained actual injury until less than a year before he filed his action frames the dispositive issue on this appeal from a judgment based on summary adjudication: whether it appears without dispute, from all the papers submitted, that Radovich had sustained actual injury more than four years before he filed his fiduciary duty action. (Cf. Code Civ. Proc., § 437c, subd. (c).)

We are satisfied that such actual injury does so appear.

■ The words "actual injury" in Code of Civil Procedure section 340.6 lend themselves to relatively broad definition in the abstract. Before section 340.6 was enacted, the Supreme Court had held that a cause of action for legal malpractice would not accrue (and thus the statute of limitations would not run) until the plaintiff had suffered "appreciable and actual" harm (*Budd* v. *Nixen, supra*, 6 Cal.3d at pp. 198, 201) that had become "irremediable." (*Heyer* v. *Flaig, supra*, 70 Cal.2d at p. 230.) During the legislative deliberation that led to section 340.6, it was proposed that the limitation periods should be tolled so long as "[t]he plaintiff has not sustained *significant* injury . . . ." (Assem. Bill No. 298 (1977-1978 Reg. Sess.) as amended May 9, 1977, italics added; cf. Mallen, *Panacea or Pandora's Box? A Statute of*

*Limitations for Lawyers, supra,* 52 State Bar J. 22, 24; *Gurkewitz* v. *Haberman, supra,* 137 Cal.App.3d at pp. 335-336, 336 fn. 3; *Southland Mechanical Constructors Corp.* v. *Nixen* (1981) 119 Cal.App.3d 417, 428 [173 Cal.Rptr. 917], disapproved in part in *Laird* v. *Blacker, supra,* 2 Cal.4th at p. 617.) In section 340.6 as enacted, the Legislature substituted the word "actual" for "significant." (Stats. 1977, ch. 863, § 1, p. 2609.) The Legislature thus implicitly rejected requirements that the injury be "irremediable" (cf. *Laird* v. *Blacker, supra,* 2 Cal.4th at pp. 612, 616) or "appreciable" (cf. *Finlayson* v. *Sanbrook, supra,* 10 Cal.App.4th at p. 1442; but cf., e.g., *Pleasant* v. *Celli, supra,* 18 Cal.App.4th at p. 846 [one of several postsection 340.6 cases that have used the word "appreciable" in addition to "actual"]) or even "significant." (Cf. Mallen, *An Examination of a Statute of Limitations for Lawyers, supra,* 53 State Bar J. at p. 167; *Laird* v. *Blacker, supra,* 2 Cal.4th at p. 617 [disapproving Court of Appeal opinions which had invoked the earlier standards].) The Supreme Court has acquiesced in a perception that "the Legislature used the term 'actual' to focus on the *fact* that damage occurred, and eliminated all qualifiers to prevent confusion that would arise by requiring courts to consider the total amount of damages." (*Laird* v. *Blacker, supra,* 2 Cal.4th at p. 613; cf. also *Foxborough* v. *Van Atta* (1994) 26 Cal.App.4th 217, 226 [31 Cal.Rptr.2d 525]; Mallen, *An Examination of a Statute of Limitations for Lawyers, supra,* 53 State Bar J. at p. 167; 2 Mallen & Smith, Legal Malpractice (1993 supp.) § 18.11, p. 34.)

In short, as an abstract proposition the search for the first "actual injury" should be easy: the first injury of any kind to the plaintiff, attributable to the defendant attorney's malfeasance or nonfeasance, should suffice.

But to apply the abstract proposition to real facts is not invariably easy: "The variety of situations in which [attorney] error can occur, and the injuries that can result, make it difficult to formulate and apply bright-line tests for 'actual injury' that resolve statute of limitations problems in all settings. . . . [T]he facts and circumstances of each case determine when the plaintiff suffered actual injury. [Citation.]" (*Foxborough* v. *Van Atta, supra,* 26 Cal.App.4th at pp. 225-226.) The variety of the conclusions appellate courts have reached attests to the validity of these generalizations.

Nevertheless some patterns have emerged from the recent cases. The broad principle of general applicability which may be derived is that the effect of asserted legal malpractice should not be identified as actual injury until it has reached a point (on a continuum between the asserted malpractice and the point at which its injurious effects become "irremediable") at which injury has been made to appear with an empirical certainty sufficient to allay the law's distaste for speculation.

When the issue of actual injury will or may be resolved in a dispute-resolution proceeding separate from the malpractice action itself, the more recent cases have manifested unwillingness to find sufficient empirical certainty before initial disposition (by settlement, judgment, or otherwise) of the separate proceeding, and neither the occurrence nor the cost of the separate proceeding will itself be regarded as "actual injury."

For example, in cases in which the malfeasance or nonfeasance assertedly occurred in the management of a litigation matter it has been suggested that "because the focus . . . is the attorney's *conduct* in the underlying case, the statute of limitations should commence," and, implicitly, actual injury should be deemed to have first occurred, " 'on entry of adverse judgment or final order' " in the underlying case itself. (*ITT, supra,* 9 Cal.4th at p. 250 [suggestions that actual harm may occur earlier disapproved]; *Laird* v. *Blacker, supra,* 2 Cal.4th at p. 615; cf. *Troche* v. *Daley* (1990) 217 Cal.App.3d 403, 410-412 [266 Cal.Rptr. 34].) The Supreme Court's apparent perception is that "the attorney's *conduct* in the underlying case" (*ITT,* 9 Cal.4th at p. 250) must be viewed as a whole, and that until the underlying case is completed there will be a significant possibility that the attorney will modify his or her conduct sufficiently to avoid actual injury to the client.

And in *ITT,* in which the malfeasance or nonfeasance assertedly occurred in a transaction context but there was a separate dispute-resolution proceeding—an adversary proceeding in a bankruptcy court—which might resolve the actual injury issue, the Supreme Court held that "in transactional legal malpractice cases, when the adequacy of the documentation is the subject of dispute, an action for attorney malpractice accrues on entry of adverse judgment, settlement, or dismissal of the underlying action." (*ITT, supra,* 9 Cal.4th at p. 258.) The Supreme Court reasoned that "[h]ad ITT prevailed in the adversary proceeding, it would have suffered no 'actual injury' from the initial attorney's preparation of the loan documents . . ." (9 Cal.4th at p. 251), and that the "initial legal fees incurred by ITT were not sufficient 'actual injury' within the meaning of section 340.6(a)(1) because at the time the proceeding was filed and ITT hired counsel to defend the loan documentation, there was no actual harm attributable to malpractice." (*Id.* at pp. 252-253.) The Supreme Court indicated that resolution of a separate proceeding might take the form of an arbitration ruling (*id.* at pp. 251-253, analyzing *Sirott* v. *Latts* (1992) 6 Cal.App.4th 923 [8 Cal.Rptr.2d 206]) or of a dispositive ruling such as a summary judgment in a separate lawsuit (*ITT,* 9 Cal.4th at pp. 253-254, disapproving *Kovacevich* v. *McKinney & Wainwright* (1993) 16 Cal.App.4th 337 [19 Cal.Rptr.2d 692]).

But not every proceeding separate from the ultimate malpractice action in a transaction malpractice case will necessarily reach the issue of actual

injury. In *Foxborough* v. *Van Atta*, *supra*, 26 Cal.App.4th at page 226,[3] Foxborough had retained the attorneys in 1979 to perform legal services in connection with a real property conversion and development project, charging the attorneys among other things to assure that certain annexations could be performed "automatically" (26 Cal.App.4th at p. 222), which is to say without approval of other owners. Under an administrative regulation automatic annexations could only be performed within a three-year period; the period expired in 1983. In 1985 Foxborough sued another principal in the real estate transaction for relief based on an assertion that the other principal had failed to notify Foxborough of the three-year limitation. In March 1990 this first action culminated in judgment adverse to Foxborough; in June 1990 Foxborough sued the attorneys for failing to advise Foxborough of the three-year period or how to avoid its effect. The attorneys obtained summary judgment on Code of Civil Procedure section 340.6 grounds; Foxborough appealed, arguing that it had not suffered actual injury until the 1990 judgment was entered. The Court of Appeal affirmed, reasoning that "[u]nlike the context of *Laird*, [the attorneys'] alleged negligence did not occur in the [first] litigation. Instead, Foxborough alleged that the [first] litigation was one of the consequences of that negligence. The judgment in the [first] litigation was not the first realization of an injury from the alleged malpractice, but rather the loss of an alternative means for obtaining monetary relief for that injury. Though [the attorneys'] alleged negligence may have contributed to the [first] litigation judgment, that judgment was but the last in time of the alleged injuries." (26 Cal.App.4th at p. 226.)

In a case such as *Foxborough*, where the separate proceeding apparently would provide no occasion to assess whether the client had suffered actual injury, or in a case in which there is no separate proceeding at all, the Supreme Court has indicated it would consider other empirical indicia of actual injury, suggesting in *ITT*.

(1)   That where an attorney assertedly failed to warn a seller of a business that the security for the buyer's obligation was inadequate, actual injury occurred not upon default on the secured obligation but upon subsequent sale of the collateral for an inadequate amount (*ITT*, *supra*, 9 Cal.4th at p. 253, disapproving *Johnson* v. *Simonelli* (1991) 231 Cal.App.3d 105 [282 Cal.Rptr. 205]); and

(2)   That a case (involving pre-Code of Civil Procedure section 340.6 issues) in which a client for whom the attorney had drafted legal documents had employed new counsel to contest a tax deficiency assessment based on

---

[3]The Supreme Court denied review in *Foxborough* on October 20, 1994, two months before it filed *ITT*.

the documents, but then had conceded the tax liability and sued the attorney, should be disapproved to the extent it could be interpreted to mean that the malpractice cause of action accrued once the client employed new counsel; inferably the Supreme Court would have accepted the concession of liability as a sufficient indication of actual injury. (*ITT, supra,* 9 Cal.4th at pp. 255-256, analyzing *Horne* v. *Peckham* (1979) 97 Cal.App.3d 404, 417 [158 Cal.Rptr. 714].)

In *Foxborough* the Court of Appeal ultimately concluded that actual injury had occurred upon expiration of the three-year period: "During the three-year period . . . , [the attorneys'] alleged negligence created only the potential for harm, because Foxborough could have proceeded with the development and annexation. But when the three-year period for automatic annexation expired . . . , Foxborough lost the right it had retained [the attorneys] to secure." (26 Cal.App.4th at p. 227.)

■ The matter before us, although it involves allegations of breach of fiduciary duty rather than of legal malpractice as such, is, like *ITT* and *Foxborough,* a case of asserted malfeasance in a transactional setting. But unlike *ITT* and *Foxborough* it involved no independent dispute-resolution proceeding at all: so far as the record reflects, until Radovich sued the defendants themselves he had neither brought nor been called upon to defend a proceeding of any kind. Thus, because there is no "underlying action," this matter does not come within *ITT*'s "narrow" holding that actual injury in a transaction malpractice case is to be established by "entry of adverse judgment, settlement, or dismissal of the underlying action." (9 Cal.4th at p. 258.)

Without the possibility of recourse to conclusions reached in separate proceedings, does actual injury appear with sufficient empirical certainty from those circumstances which are of record?

The record reflects that in 1957 Radovich entered into a prenuptial agreement which on its face was sufficient under California law to fix the property rights of the parties in accordance with its terms. (*Cheney* v. *City & County of San Francisco* (1936) 7 Cal.2d 565, 569 [61 P.2d 754]; *Barker* v. *Barker* (1956) 139 Cal.App.2d 206, 212 [293 P.2d 85]; cf. *In re Marriage of Dawley* (1976) 17 Cal.3d 342, 349 [131 Cal.Rptr. 3, 551 P.2d 323]; 1 Cal. Marital Dissolution Practice (Cont.Ed.Bar 1981) § 7.55, p. 217 et seq.) By its terms the agreement provided among other things that "[a]ll property owned by [the decedent] at the time of her marriage and all that may be acquired thereafter by gift, bequest, inheritance or devise, and all earnings earned by her subsequent to said marriage, shall be and remain her s[ep]arate

property, together with the rents, issues and profits thereof," and that "[n]o community property shall exist during the marriage of the parties hereto." Radovich and the decedent were married later that year. In 1974 Radovich acknowledged in writing that the Borina Orchards partnership agreement "involves property which is wholly the separate property of" the decedent, and to this extent acknowledged the effect of the 1957 agreement. In 1985 Radovich acknowledged in writing that "[m]y wife [the dedecent] and I have no community property, as more fully set forth in a written agreement between us dated May 9, 1957," the prenuptial agreement.

Radovich took the position that the law firm, and Locke-Paddon from the time he was first employed by the law firm in 1967, breached fiduciary duties to him in connection with each of these transactions. The crux of his fiduciary duty action, as incorporated by reference into the fifth count directed to these defendants, was that these transactions had caused him injury by denying him community-property access to the decedent's earnings, and foreclosing his potential claims to community-property shares in the Borina Orchards businesses, "[t]hroughout the thirty-four years of the marriage" between 1957 and the death of the decedent in 1991.

Radovich's assertion that the wrongs of which he complained did not cause him injury until at or after the time of the decedent's death is inexplicable. Throughout his marriage to the decedent Radovich would have had a "present, existing and equal" interest (former Civ. Code, § 5105 [1969-1994] *id.* § 161a [1927-1969] provision is now in Fam. Code, § 751) in community property acquired by either of them during the marriage (including among other things their earnings, pofits of any separate property business to which either contributed labor or skill, and the proceeds of community property thus accumulated), and the community property would have been subject in varying measure to his control and disposition and to application to his debts. (Cf. generally, 11 Witkin, Summary of Cal. Law (9th ed. 1990) Community Property.) Among other things such community property would have been subject to division between Radovich and the decedent in the event of a dissolution of the marriage. (*Id.* § 160 et seq.) Each of these considerations would have been of real and immediate benefit to Radovich "[t]hroughout the thirty-four years of the marriage," and it follows that the agreement by which he ostensibly relinquished any community-property right in the decedent's acquisitions (and the subsequent documents by which he acknowledged the agreement and its continuing effect) caused him immediate and actual injury throughout the same thirty-four years.

As thus analyzed, the matter before us is analogous to *Turley* v. *Wooldridge* (1991) 230 Cal.App.3d 586 [281 Cal.Rptr. 441] and *Hensley* v. *Caietti*

(1993) 13 Cal.App.4th 1165 [16 Cal.Rptr.2d 837], in each of which a Court of Appeal found actual injury upon execution of an agreement dividing marital property in the course of dissolution proceedings. In each instance the client asserted that the attorney had given inadequate advice and representation in connection with the agreement; in each instance the ongoing dissolution proceeding gave no occasion to test the client's hypothesis that the asserted malpractice had injured the client.

*Turley* involved the four-year occurrence period. With respect to the property-division aspects of the agreement, the Court of Appeal said: "If her claims of malpractice are true, Turley suffered actual harm when the Agreement was signed on June 21, 1982. . . . [T]he Agreement 'provides for its effectiveness on the date of execution; provides for present transfers of interest in property and the effectiveness of the agreement or the transfers of property were not made contingent upon approval by the court and the provisions of the agreement relating to the transfer of property were not to be merged in the anticipated Interlocutory Judgment . . . .' By its terms, the Agreement was effective on the date it was signed by the parties. Therefore, the provisions awarding Turley inadequate support and less than her share of the community property were operational on that date. [Citations.] At that point, her damages were not speculative, but appreciable. The fact that she could have challenged the Agreement in an action for rescission or other contract relief, or the interlocutory judgment under section 473 or the court's equitable powers did not affect the date she suffered actual harm. When she signed the purportedly unfair Agreement on the alleged negligent advice of counsel and thereby rendered it effective, all essential elements of her cause of action for legal malpractice had occurred. There was no justification for tolling the statute of limitations beyond that point." (230 Cal.App.3d at pp. 592-593, fn. omitted.)

*Hensley* involved both the actual injury issue and Code of Civil Procedure section 340.6's provision for tolling during continuing representation by the attorney (Code Civ. Proc., § 340.6, subd. (a)(2)). On "actual injury," the plaintiff relied on *Laird*'s broad statement that the statute " 'commences on entry of adverse judgment or final order of dismissal.' " (13 Cal.App.4th at p. 1174, quoting from *Laird* v. *Blacker*, *supra*, 2 Cal.4th at p. 615.) The Court of Appeal concluded that "*Laird* is inapposite as it cannot reasonably be construed to have addressed the point whether events other than entry of an adverse judgment can satisfy the criteria of actual injury." (13 Cal.App.4th at p. 1174.) The court agreed with *Turley*'s conclusion but phrased its reasoning even more broadly: "Negligent legal advice which induces a client to enter into a binding contract resolving marital property and support issues results in actual injury at the point of entry. Entering a

contract is a jural act which alters the legal relations of the parties and creates an obligation. [Citation.] The tortious inducement to enter into a contract which imposes noncontingent obligations is actionable at the time of contracting. [¶] Here the contract allegedly unfairly deprived Hensley of her fair share of community property. The facts adduced at the summary judgment proceeding compel the conclusion that the contractual allocation was effective immediately. The parties obtained possessory rights to the allocated chattels and realty and Hensley's former spouse was obliged to make a partial payment of the monetary offset 'forthwith.' The trial court, without correction, declared that 'the stipulation is effective and will be effective as of this morning.' " (*Id.* at p. 1175.) The Court of Appeal added that the fact the provisions of the agreement might subsequently be incorporated into a judgment would not postpone actual injury. (*Id.* at pp. 1175-1176.)

In *ITT* the defendant attorney cited *Hensley* in support of his argument that actual injury had occurred when ITT retained independent counsel in the adversary proceeding in bankruptcy. The Supreme Court responded that "*Hensley* is distinguishable on its facts. In *Hensley*, the stipulation to the marital settlement agreement acted immediately to deprive the plaintiff of certain property. Thus, once the stipulation was entered by the court, the plaintiff suffered 'actual injury' under section 340.6(a)(1). . . . By contrast, as noted above, ITT did not suffer 'actual injury' until it entered into the adverse settlement agreement with the debtor. In essence, the *Hensley* final settlement agreement, like the ITT settlement agreement with the debtor, acted as the benchmark from which the plaintiff could sue for legal malpractice, for that is the point the malpractice was both discovered and confirmed *and* the plaintiff was damaged." (9 Cal.4th at p. 255.)

*Turley*, *Hensley*, and the distinction the Supreme Court drew between *Hensley* and the circumstances of *ITT* all support our conclusion that for purposes of Code of Civil Procedure section 340.6 there was sufficient empirical certainty of actual injury in 1957, when Radovich executed the prenuptial agreement, as well as in 1974 and again in 1985 when he reaffirmed in writing the apparent effect of the 1957 agreement.

Radovich has asked that we take judicial notice of the facts that (after Locke-Paddon and the law firm were excused from the fiduciary duty action by virtue of the proceedings we now review) Radovich pursued his fiduciary duty action to trial and obtained a jury verdict and judgment that his signatures on the 1957 agreement and on the 1974 partnership agreement were obtained by the decedent's "fraud and/or undue influence," and that he was entitled (among other elements of recovery) to nearly $1.8 million as the

value his "community property rights" in the decedent's estate. Having solicited and received the parties' supplemental briefing on the issues raised by Radovich's request, we shall take notice of the judgment for purposes of discussion but shall conclude that the judgment is irrelevant to our conclusion that as to Locke-Paddon and the law firm the fiduciary duty action was properly found barred by Code of Civil Procedure section 340.6.

Radovich argues that because his assent to the 1957 prenuptial agreement, and his 1974 acknowledgment of the effect of that agreement, have been found to have been vitiated by fraud and overreaching, he cannot be said to have suffered actual injury, for purposes of Code of Civil Procedure section 340.6, by virtue of either the agreement or his subsequent ostensible acknowledgment of its effect. Alternatively he argues that the validity of the various documents was still in litigation at the time the summary adjudication motions were heard.

Locke-Paddon and the law firm colorably assert that Radovich's recently obtained judgment cannot be deemed relevant to this appeal inasmuch as the judgment was obtained long after entry of the order appealed from, and even if relevant the jury's findings did not vitiate Radovich's acknowledgment, in 1985, that "[m]y wife and I have no community property, as more fully set forth in [the 1957] agreement . . . ."

We need not reach these assertions because we conclude that Radovich's arguments are unavailing in any event.

By his fiduciary duty action Radovich sought specified *remedies* for the injury we have enumerated: various judicial declarations and determinations, an accounting, penalties, compensatory and punitive damages, attorney fees and costs of suit, and other relief in the court's discretion. By recovering at least the compensatory damages and costs of suit reflected in the judgment he has placed before us, Radovich has by no means demonstrated that he was *not* injured more than four years before he filed his fiduciary duty action. To the contrary, his success in obtaining certain of the remedies he sought necessarily implies that the jury accepted his premise that he *had* been injured, and the facts make clear that the injury on which he based his successful claim for relief manifested itself first in 1957 and thereafter from time to time over the intervening years.

The fact that Radovich was able to obtain remedies for his injury would not negate the existence of the injury for purposes of Code of Civil Procedure section 340.6. ■ *Laird* made clear that once actual injury has been found, the fact the injury is not "irremediable" is of no consequence to the

section 340.6 issues: Although the injury must be "actual," the Legislature has rejected the requirement that it be "irremediable." (*Laird* v. *Blacker, supra,* 2 Cal.4th at pp. 614-615; cf. also *Turley* v. *Wooldridge, supra,* 230 Cal.App.3d at pp. 592-593 ["The fact that [the plaintiff] could have challenged the Agreement in an action for rescission or other contract relief . . . did not affect the date she suffered actual harm"]; *Hensley* v. *Caietti, supra,* 13 Cal.App.4th at p. 1176 ["[t]he consideration that the injury attributable to entry into the contract may be remediable by the attack on the contract does not render the injury harmless"]; cf. also *Worton* v. *Worton* (1991) 234 Cal.App.3d 1638, 1652 [286 Cal.Rptr. 410].) As the Court of Appeal pointed out in *Foxborough,* ". . . when malpractice results in the loss of a right, remedy, or interest, or in the imposition of a liability, there has been actual injury regardless of whether future events may affect the permanency of the injury or the amount of monetary damages eventually incurred." (*Foxborough* v. *Van Atta, supra,* 26 Cal.App.4th at p. 227.)

In his reply brief Radovich belatedly argued that the conduct of Locke-Paddon and the law firm, as described in Radovich's fifth count, was "fraudulent" and thus that, by virtue of Code of Civil Procedure section 340.6's exception for "actual fraud," the section's limitation periods do not apply at all.

■ We normally follow the general rule "that *points raised in the reply brief for the first time will not be considered,* unless good reason is shown for failure to present them before. [Citations.]" (9 Witkin, Cal. Procedure, *supra,* Appeal, § 496, pp. 484-485.) In any event Radovich's argument would fail for want of a factual predicate: Radovich did in fact plead (in a form-book allegation to support a prayer for punitive damages) that the conduct of Locke-Paddon and the law firm "was fraudulent, malicious and oppressive," but he neither pled nor tendered facts to lend substance to this wholly conclusionary allegation.

The judgment is affirmed. Defendants and respondents shall recover their costs on appeal.

Premo, Acting P. J., and Elia, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 14, 1995.