119 Cal.Rptr.2d 229 (2002)
97 Cal.App.4th 1411
Russell SEHEULT, Plaintiff and Appellant,
v.
JEFFER, MANGELS, BUTLER & MARMARO, LLP, et al., Defendants and Respondents.
No. B146243.
Court of Appeal, Second District, Division Seven.
April 30, 2002.
As Modified May 21, 2002.
Review Denied July 17, 2002.[*]
*230 Joseph R. Zamora, Santa Monica, for Plaintiff and Appellant.
Baker and Jacobson, Robert P. Baker and Lawrence M. Jacobson, Los Angeles, for Defendants and Respondents.
PERLUSS, J.
Plaintiff and appellant Russell Seheult appeals from a judgment in a legal malpractice action entered in favor of defendants and respondents Jeffer, Mangels, Butler & Marmaro, LLP, Jeffrey Steiner and David Waite (collectively, the lawyers) after the trial court granted the lawyers' motion for summary judgment. We hold that creation of an enforceable obligation is "actual injury" whether or not attorney fees or other quantifiable costs have yet been incurred in efforts to defeat or limit the liability. Accordingly, we affirm the judgment based on the lawyers' statute of limitations defense.

FACTUAL AND PROCEDURAL BACKGROUND

1. The Proposed Partnership and the Taubman Notes

Seheult describes himself as a "dental surgeon and business investor." In 1995 Seheult and Nu-Western Development Company (Nu-Western) agreed to form a limited partnership to develop an enclosed shopping mall in Redlands, California, to be known as the "Redlands Fashion Center" or "RFC." The lawyers were retained to create a limited partnership between Seheult and Nu-Western, to be called Shannon Brooke Limited Partnership (Shannon Brooke), and to provide other legal services in connection with the RFC project.
During the time the lawyers were working on the partnership agreement, Seheult and Nu-Western entered into a preliminary letter agreement with Taubman Realty Group Limited Partnership (Taubman), whereby Taubman would provide services relating to developing the RFC project including entitlements processing. The parties contemplated forming a joint venture between Shannon Brooke and Taubman to develop the project. Pursuant to the letter agreement with Taubman, Seheult and Nu-Western executed certain promissory notes in favor of Taubman for development costs (the Taubman notes). Taubman advanced $200,000 for legal expenses, entitlements, purchase options and other costs, which was secured by the notes. Seheult understood that once Shannon Brooke was actually formed, he would have no further liability under the Taubman notes.
The lawyers worked on the RFC project until April 1997 when they ceased providing services due to nonpayment. In late May 1997, Taubman abandoned the RFC project because Seheult and Nu-Western failed to satisfy certain conditions set forth in the letter agreement. Taubman made written demand on Seheult for payment of the Taubman notes by letter dated August 18, 1997. Taubman filed suit against Seheult and Nu-Western on October 17, 1997. That lawsuit was settled on August 3,1999.

2. Seheult's Complaint

The complaint in this action was filed on October 19, 1998. Seheult alleged that he retained the lawyers to form Shannon Brooke and to represent him in connection with the development of RFC. He alleged the lawyers were negligent in (a) failing to form Shannon Brooke to limit his personal liability for the debts of RFC; (b) failing to obtain a final development agreement between Taubman and the development group or Shannon Brooke; (c) failing to *231 disclose they were also representing Taubman during the relevant times; (d) failing to enter into a retainer agreement with Seheult in violation of the rules and regulations of the State Bar; (e) allowing Taubman to delay the signing of the final development agreement; (f) subjecting Seheult to personal liability for debts that were incurred by Shannon Brooke; (g) failing to disclose conflicts and obtain proper consent to dual representation; and (h) failing to notify Seheult regarding a call of securities even though the lawyers had notice of the call. Based on these allegations, the complaint alleged causes of action for malpractice, breach of fiduciary duty and breach of oral contract.

3. The Lawyers' Summary Judgment Motions

The lawyers filed a motion for summary judgment on February 18, 2000 (the first motion) in which they argued (a) they did not represent Seheult individually and had no contract with him; (b) they owed no duty to him; (c) they committed no wrongful acts; and (d) Seheult was not damaged by any of their acts or omissions. The hearing on the first motion was continued several times at Seheult's request. On May 26, 2000 the lawyers filed a second motion for summary judgment (the second motion) based upon the expiration of the statute of limitations.
The two motions were heard on July 27, 2000. The trial court granted both motions, ruling in favor of the lawyers on all counts. Judgment was entered on August 16, 2000. Seheult filed a timely notice of appeal.

CONTENTIONS
Seheult contends that his malpractice action is timely because he suffered no actual injury as a result of the lawyers' alleged negligence in failing to form the limited partnership until he began incurring attorney fees to defend the Taubman note litigation. The lawyers contend that the limitations period began to run, at the latest, when Taubman demanded payment on the note from Seheult personally. Seheult also contends that the trial court committed reversible error in denying his motion for leave to amend the complaint.

DISCUSSION

1. Standard of Review

The standard of review for an order granting summary judgment was recently reiterated by our Supreme Court as follows: "A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. [Citation.] We review the trial court's decision de novo, considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports. [Citation.] In the trial court, once a moving defendant has `shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established,' the burden shifts to the plaintiff to show the existence of a triable issue; to meet that burden, the plaintiff `may not rely upon the mere allegations or denials of its pleadings ... but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action....' [Citations.]" (Merrill v. Navegar, Inc. (2001) 26 Cal.4th 465, 476-477, 110 Cal.Rptr.2d 370, 28 P.3d 116; see also Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 854-855, 107 Cal.Rptr.2d 841, 24 P.3d 493; Katz v. Chevron Corp. (1994) 22 Cal.App.4th 1352, 1363-1364, 27 Cal.Rptr.2d 681.)

*232 2. The Statute of Limitations Began to Run When Seheult Sustained the First "Actual Injury" Stemming from the Lawyers' Malpractice, Even Though Other Injuries May Have Occurred Later

Code of Civil Procedure section 340.6 provides: "(a) An action against an attorney for a wrongful act or omission, other than for actual fraud, arising in the performance of professional services shall be commenced within one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the facts constituting the wrongful act or omission, or four years from the date of the wrongful act or omission, whichever occurs first." This limitations period is tolled during the time "[t]he plaintiff has not sustained actual injury." (Code Civ. Proc, § 340.6, subd. (a)(1).)[1]
Seheult contends that once Shannon-Brooke was actually formed, Taubman would permit Shannon Brooke to assume liability on the Taubman notes, thereby relieving the partners of individual liability. The lawyers contend Seheult suffered "actual injury," at the latest, when Taubman demanded that Seheult personally and Nu-Western make good on the Taubman notes.[2] We agree with the lawyers.
Although Seheult's brief refers to other items of damages such as the "Diffenbach action" and the "Churchill threatened lawsuit" and his complaint refers to yet other items of damage, the complaint contains only a single claim for malpractice, a single claim for breach of fiduciary duty and a single claim for breach of contract, all of which were based on the same conduct by the lawyers.[3] Because he alleged only a single claim, the statute of limitations began to run when Seheult suffered the first actual injury from any of the alleged wrongful acts. (Bennett v. Shahhal (1999) 75 Cal.App.4th 384, 391-392, 89 Cal.Rptr.2d 272 ["`"As a general rule, where an injury, although slight, is sustained in consequence of the wrongful act of another, ... the statute of limitations attaches at once. It is not material that all the damages [resulting] from the act shall have been sustained at that time, and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date...."'"].) Moreover, a claim for legal malpractice arises "before the client sustains all, or even the greater part, of the damages occasioned by his [or her] attorney's *233 negligence. [Citations.] Any appreciable and actual harm flowing from the attorney's negligent conduct establishes a cause of action upon which the client may sue." (Budd v. Nixen (1971) 6 Cal.3d 195, 201, 98 Cal.Rptr. 849, 491 P.2d 433, italics added.) Therefore, our statute of limitations analysis concerns only the alleged injury that occurred first in timethe lawyers' failure to complete the partnership and Seheult's resulting personal liability for the Taubman notes.

3. The Creation of an Enforceable Personal Obligation That Would Have Been Avoided by Formation of Shannon-Brooke Constituted "Actual Injury"

In his complaint Seheult alleges the lawyers' failure to complete formation of the limited partnership agreement caused him to become personally liable for the Taubman notes, a liability that should have been borne by the partnership. Assuming this to be the case, Seheult suffered "actual injury," at the latest, when the notes matured and Taubman made demand for payment of those debts.
The undisputed facts establish that Seheult always knew that no limited partnership agreement had been executed. He did not contact the lawyers regarding the status of the partnership agreement after May 27, 1997 and was aware that "the project ... was no longer viable and it went away" and the lawyers were not representing him in connection with the partnership after that date.[4] It is also undisputed that the lawyers stopped working on the RFC project in April 1997 due to nonpayment. It is further undisputed that Taubman made written demand on the Taubman notes in a letter dated August 18, 1997. Seheult filed his complaint on October 19, 1998, more than one year later.
In holding Seheult suffered "actual injury" when the lawyers stopped work without completing the partnership, the Taubman notes matured and demand was made on Seheult personally, we are guided by the decision in Foxborough v. Van Atta (1994) 26 Cal.App.4th 217, 31 Cal.Rptr.2d 525 (Foxborough). Foxborough involved alleged attorney negligence that caused the client to lose an unrestricted right to annex the subsequent development of a property to an existing apartment complex: "Foxborough owned two adjoining parcels of land in San Jose. On one parcel was a 296 unit apartment complex (the Apartments); the smaller parcel was undeveloped. From November 1978 through January 1981, Foxborough retained Van Atta to perform legal services concerning the two parcels. Van Atta was to assist in converting the Apartments into condominiums, transferring the Apartments to Daon Corporation (Daon) in a property exchange, and securing the right to develop the smaller parcel with condominiums that Foxborough could automatically annex to the Apartments without the approval of Daon or the owners of condominiums in the Apartments. The automatic annexation right, without time constraints, was of particular importance to Foxborough." (Id. at p. 222, 31 Cal.Rptr.2d 525.) Van Atta failed to obtain the automatic annexation right. (Ibid.) Foxborough learned of this failure no later than February 1985. (Id. at p. 223, 31 Cal.Rptr.2d 525.) Foxborough subsequently sued Daon for failing to inform it of the limitation on its annexation *234 right, but the Daon litigation was unsuccessful. On March 2, 1990 Foxborough lost its case and was ordered to pay Daon's attorney fees and costs. (Ibid.)
Foxborough brought suit against Van Attta on June 29, 1990. (Foxborough, supra, 26 Cal.App.4th at p. 223, 31 Cal. Rptr.2d 525.) The trial court granted summary judgment based on the statute of limitations. (Id. at p. 224, 31 Cal.Rptr.2d 525.) On appeal, Foxborough contended its action was not time-barred because it did not suffer actual injury until it lost the Daon litigation. (Id. at p. 225, 31 Cal. Rptr.2d 525.) The Court of Appeal rejected that argument, explaining "[t]hough Van Atta's alleged negligence may have contributed to the Daon litigation judgment, that judgment was but the last in time of the alleged injuries." (Id. at p. 226, 31 Cal.Rptr.2d 525.)
"[W]hen malpractice results in the loss of a right, remedy, or interest, or in the imposition of a liability, there has been actual injury regardless of whether future events may affect the permanency of the injury or the amount of monetary damages eventually incurred. [Citations.] ... [¶] Applying these principles to the undisputed facts in this case, we conclude that Foxborough sustained actual injury well outside the statutory period. One of Foxborough's key objectives was to secure an unrestricted right to annex subsequent development of the retained parcel to the Apartments. During the three-year period that Foxborough could have effected an automatic annexation under the pertinent regulation [citation], Van Atta's alleged negligence created only the potential for harm, because Foxborough could have proceeded with the development and annexation. But when the three-year period for automatic annexation expired on May 8, 1983, Foxborough lost the right it had retained Van Atta to secure. Foxborough then had to resort to the more onerous, expensive, and unpredictable task of obtaining annexation approval from the Apartments' owners, the very situation it hired Van Atta to avoid. [Citation.] [¶] Therefore, Foxborough sustained actual injury before its February 1985 discovery of the facts constituting the alleged wrongful act or omission." (Foxborough, supra, 26 Cal.App.4th at p. 227, 31 Cal.Rptr.2d 525.)
In Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison (1998) 18 Cal.4th 739, 76 Cal.Rptr.2d 749, 958 P.2d 1062 (Jordache), the California Supreme Court held "[t]he loss or diminution of a right or remedy constitutes injury or damage. [Citation.] Neither uncertainty of amount nor difficulty of proof renders that injury speculative or inchoate." (Id. at p. 744, 76 Cal.Rptr.2d 749, 958 P.2d 1062.) Citing Foxborough, it also held "[a]n existing injury is not contingent or speculative simply because future events may affect its permanency or the amount of monetary damages eventually incurred. [Citations.] Thus, we must distinguish between an actual, existing injury that might be remedied or reduced in the future, and a speculative or contingent injury that might or might not arise in the future." (Id. at p. 754, 76 Cal.Rptr.2d 749, 958 P.2d 1062.) Accordingly, while a lawyer's error might give rise to related litigation between the client and a third party, the conclusion of such related litigation is not always synonymous with "actual injury" as used in Code of Civil Procedure section 340.6. (Id. at p. 755, 76 Cal.Rptr.2d 749, 958 P.2d 1062; see also Laird v. Blacker (1992) 2 Cal.4th 606, 614, 7 Cal.Rptr.2d 550, 828 P.2d 691 ["We disagree with plaintiff that actual injury should be defined in terms of monetary amount and that a successful appeal negates the client's ability to file a malpractice action. To the contrary, although appellate review may correct judicial error, *235 and thus reduce the client's damages, an appeal does not necessarily exonerate the attorney, nor does it extinguish the client's action again him for negligence in the conduct of trial. [Citation.]"].)
Seheult concedes the loss or diminution of a right or remedy constitutes injury or damage. (See Adams v. Paul (1995) 11 Cal.4th 583, 597, 46 Cal.Rptr.2d 594, 904 P.2d 1205.) He also concedes damages can include the loss of an interest or the imposition of liability. (Foxborough, supra, 26 Cal.App.4th at p. 227, 31 Cal. Rptr.2d 525 ["when malpractice results in the loss of a right, remedy, or interest, or in the imposition of a liability, there has been actual injury regardless of whether future events may affect the permanency of the injury or the amount of monetary damages eventually incurred"]; Jordache, supra, 18 Cal.4th at p. 750, 76 Cal.Rptr.2d 749, 958 P.2d 1062 [same]; Radovich v. Locke-Paddon (1995) 35 Cal.App.4th 946, 978, 41 Cal.Rptr.2d 573 [same].) Yet he contends, without any citation to authority, that he "did not suffer any actual and appreciable harm until the time of the settlement of the Taubman case in 1998 and the settlement of the Diffenbaugh claim, also in 1998," or at the earliest when he started incurring legal fees in those actions in November 1997. We cannot agree.
Like the lawyer in Foxborough, the lawyers in this case were retained to effect a transaction that would give the client certain rights and avoid certain liabilities. In Foxborough the right at issue was a right to annexation with no time limit. In the present case the right was to be a limited partner rather than a personal guarantor of notes executed with respect to the RFC project, and thus to avoid personal liability on the Taubman notes. Seheult admits that no later than August 18, 1997 the lawyers had ceased working on the partnership agreement, the RFC deal had "gone away," and Taubman was demanding payment on the Taubman notes. Thus, at that point Seheult had certainly lost the right he had retained the lawyers to secure: the protection he anticipated receiving from Shannon Brooke. (See Foxborough, supra, 26 Cal.App.4th at p. 227, 31 Cal.Rptr.2d 525 [actual injury was sustained when "Foxborough lost the right it had retained Van Atta to secure"].) The fact he did not incur legal fees in connection with the loss of that right until later does not change the fact of the injury. (Adams v. Paul, supra, 11 Cal.4th at 591, 46 Cal.Rptr.2d 594, 904 P.2d 1205, fn. 5 ["Although expenditure of attorney fees or other costs in many instances clearly would be sufficient to constitute the requisite injury, nothing in the history of section 340.6(a)(1) or its decisional predicates suggests it is necessary. In some circumstances, the loss or substantial impairment of a right or remedy itself may constitute actual injury and may well precede quantifiable financial costs."].)
Our holding that creation of an enforceable obligation is "actual injury" prior to efforts by the obligee to enforce it is consistent with the analysis in cases of alleged malpractice by tax lawyers. For example, in Yandell v. Baker (1968) 258 Cal.App.2d 308, 65 Cal.Rptr. 606, overruled on other grounds in Neel v. Magana, Olney, Levy, Cathcart & Gelfand (1971) 6 Cal.3d 176, 190, footnote 2, 98 Cal.Rptr. 837, 491 P.2d 421, involving a lawyer sued by former clients for negligent advice that resulted in an unnecessary tax liability, the Court of Appeal held: "Once [the clients' corporation] was dissolved and its assets were distributed, the liability for payment of ordinary income rates, rather than capital gains rates, arose and the damage was doneeven though the amount of damage or liability could not be determined until the Internal Revenue Service acted later." *236 (Yandell v. Baker, supra, at p. 314, 65 Cal.Rptr. 606.) And in United States v. Guttennan (9th Cir.1983) 701 F.2d 104, a case cited with approval in both Justice Arabian's lead opinion in Adams v. Paul, supra, 11 Cal.4th at page 590, 46 Cal. Rptr.2d 594, 904 P.2d 1205, and Justice Kennard's concurring opinion (id. at p. 597, 46 Cal.Rptr.2d 594, 904 P.2d 1205), the Ninth Circuit held under California law the client had suffered actual injury "at the latest" when the IRS assessed the tax penalty. "Liability for a tax assessment caused by a lawyer's malpractice is actual damage, since an enforceable obligation has come into existence." (United States v. Gutterman, supra, at p. 106.)
Seheult relies heavily on Sindell v. Gibson, Dunn & Crutcher (1997) 54 Cal. App.4th 1457, 63 Cal.Rptr.2d 594 (Sindell) to support his contention that he suffered "actual injury" only upon the filing of the Taubman lawsuit. In Sindell, the attorney was engaged to draft an estate plan for a client and negligently failed to obtain acknowledgement from the client's wife as to the non-community nature of certain assets. (Id. at pp. 1468-1469, 63 Cal.Rptr.2d 594.) After the wife lost her mental capacity due to age and illness, her children from a prior marriage brought suit against the husband and his children, asserting a community property claim to the husband's property. (Id. at p. 1462, 63 Cal. Rptr.2d 594.) The client sued the lawyer for malpractice based on his failure to obtain the wife's consent. The trial court sustained the lawyer's demurrer on the ground the cause of action had not yet accrued because the client would only suffer "actual injury" in the event of an adverse judgment in the community property litigation. (Id. at p. 1470, 63 Cal.Rptr.2d 594.) Division Three of this court reversed the judgment of the trial court, holding that the malpractice action was not premature because the client sustained "actual injury" when the community property action was filed. (Id. at p. 1473, 63 Cal.Rptr.2d 594.)
Seheult erroneously argues that Sindell, supra, 54 Cal.App.4th 1457, 63 Cal.Rptr.2d 594, imposes a bright-line rule that actual injury in a transactional malpractice case occurs only upon the filing of litigation related to the underlying transaction. The important fact in Sindell was not that the client had been injured by having to incur legal fees to defend the lawsuit, but rather that the litigation was the precise event the lawyer had been hired to avoid: "Where, as here, the purpose of a lawyer's retention is to place the client and his or her intended beneficiaries in a posture of quiet ownership of assets, and the lawyer negligently fails to obtain a simple written consent which would all but preclude costly litigation, the mere fact of such litigation is the unwanted consequence. The litigation represents the loss of the bargained-for benefit; the litigation itself is the event which constitutes damage." (Id. at p. 1470, 63 Cal.Rptr.2d 594.)
In the present case, the purpose of the lawyers' retention was to form the Shannon Brooke partnership and thus to shield Seheult from personal liability on the Taubman notes. When the notes came due and Taubman made a demand for payment, Seheult was under a real and current personal obligation to pay, and had thus suffered the unwanted consequence he hired the lawyers to avoid. Under Sindell, supra, 54 Cal.App.4th 1457, 63 Cal.Rptr.2d 594, this constitutes "actual injury" for purposes of the statute of limitations.
The dissenting opinion's description of Sehuelt's personal obligation to Taubman as only a "contingent injury" until some portion of the debt is paid or a lawyer hired to contest it disregards the economic *237 significance of an enforceable personal obligation that would have been avoided entirely (according to Sehuelt) if the lawyers had formed Shannon Brooke.[5] The existence of this debt and Taubman's demand to be paid would need to be reflected as a liability on Seheult's personal balance sheet and reduced his net worth to the same extent as would the loss of an asset. (See, e.g., Kenly v. Ukegawa (1993) 16 Cal.App.4th 49, 57, 19 Cal.Rptr.2d 771 [punitive damage award improper if it focuses "solely on the assets side of the balance sheet without examining the liabilities side of the balance sheet"].) To be sure, until the debt is paid or a lawyer retained Sehuelt may not be able to quantify his damages. But "actual injury ... may well precede quantifiable financial costs." (Adams v. Paul, supra, 11 Cal.4th at p. 591, fn. 5, 46 Cal.Rptr.2d 594, 904 P.2d 1205.)

4. The Trial Court's Denial of Seheult's Motion to Amend His Complaint Did Not Constitute Prejudicial Error

Seheult also contends the trial court erred in denying his motion for leave to amend his complaint to add additional facts supporting the existing causes of action and to add a cause of action for fraud. "Error in and of itself does not necessarily require the reversal of a judgment. Prejudice resulting from the error must be shown and that such prejudicial error under the circumstances justifies a reversal." (Hoyt v. Los Angeles Metropolitan Transit Authority (1962) 210 Cal.App.2d 534, 538, 26 Cal.Rptr. 666.) In this case, the denial of the motion for leave to amend caused no prejudice. The existing causes of action were, as we have held, time-barred. The proposed fraud claim is now the subject of a new action filed by Seheult in the superior court. Therefore, Seheult has not lost the opportunity to litigate any viable claim.

DISPOSITION
The judgment of the trial court is affirmed. Respondents are to recover their costs on appeal.
I concur: WOODS, J.
JOHNSON, J., Dissenting.
I respectfully dissent.
There are two reasons: First, to urge the Supreme Court to consider the issue raised in this case, even though it may be reluctant to revisit, yet again, the general problem of the legal malpractice limitations period it has felt compelled to address several times in the past decade. Second, to explain my concerns about the position adopted in the majority opinion, which appears to create a "bright line" rule in a class of cases not addressed in prior Supreme Court decisions discussing when an "actual injury" occurs. As explained more fully below, the beginning point the majority opinion selectsthe potential claimant's first contact with the client requesting paymentmay have the effect of commencing the statute of limitations period before the client's legal malpractice action has accrued.
The majority opinion seizes on general pronouncements from our high court in the course of deciding what constitutes "actual injury" and applies those pronouncements to the facts of this case. In particular, my colleagues emphasizeand twice repeat the phrase "when malpractice results in the loss of a right, remedy, or interest, or in the imposition of liability, there has *238 been actual injury....." (Italics added.)[1] According to the majority's reasoning, a purported debtor's letter demanding payment equates with an "imposition of liability" and thus the appellant here suffered an "actual injury" at the moment he received such a letter. As a result, the 340.6 tolling period expired and, since the client already had discovered the law firm's malpractice, the one-year statute of limitations began running.
I question whether such a bright line rule exists. At a minimum, in holding the mere existence of a purported cause of action against the client constitutes an "actual injury" the majority opinion takes a long stride beyond the issues the Supreme Court actually decided in its decisions thus far. Consequently, I briefly rehearse the facts of those cases and what the Supreme Court decided.

I. THE SUPREME COURT HAS DISAVOWED BRIGHT LINE RULES AND REQUIRES AN INJURY TO BE PALPABLE AND DEFINITE AND SUFFICIENT TO PROVIDE THE DAMAGE ELEMENT OF A MALPRACTICE CAUSE OF ACTION BEFORE IT IS CONSIDERED AN `ACTUAL INJURY" FOR PURPOSES OF 340.6.
The Supreme Court has struggled mightily with the problem of defining "actual injury" ever since it decided Laird v. Blacker[2] and embarked on an effort to find a substitute for the earlier requirement found in some cases that an injury be "irremedial" to be "actual." In a series of decisions since then the Supreme Court majority has shifted between the search for a "bright line" rule or rules, and a requirement clients and the reviewing courts engage in an ad hoc examination of the "particular facts of each case ... in light of the wrongful act or omission the plaintiff alleges against the attorney."[3]
Chief Justice George, former Chief Justice Lucas, and Justice Mosk advocated the court establish "bright line" rules and persuaded enough other justices to form a majority in ITT Small Business Finance Corp. v. Niles,[4] decided in 1994. But only a year later, in Adams v. Paul, a new majority coalesced and rejected "bright lines," opting instead for individualized inquiries. "The myriad of circumstances under which statute of limitations issues may arise in missed statute cases sharply illustrates the practicality of applying the prevailing `question-of-fact' rule to the determination of when actual injury occurs. The number of potential variables, which do not necessarily follow a set pattern, precludes defining the point of harm as a fixed point or event because reasonable application becomes too problematic. The *239 issue may be resolved `as a matter of law' only if the facts are undisputed. (Citation omitted.)"[5]
The Supreme Court solidified this rejection of "bright line" rules in its most recent decision describing when an "actual injury" occurs, Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison, decided in 1998. "[T]he determination of when attorney error has caused actual injury under section 340.6, subdivision (a)(1), cannot depend on facile, `bright line' rules."[6]
The other question at stake in Laird v. Blacker and the line of cases which followed it was whether a client only experienced "actual injury" at the moment the trial court entered judgment in the underlying case, or whether it could occur earlier. Laird v. Blacker itself held "actual injury" need not await an appeal of the trial court judgment and under the facts of that case fixed the time of "actual injury" as the date when the trial court entered judgment.[7] When the Adams plurality ruled "actual injury" could occur before the trial court rendered its judgment, Justices George, Lucas, and Mosk dissented. They argued Adams represented a retreat from this rule they deemed the court had announced in Laird v. Blacker, as did George and Mosk once again in Jordache.[8] In those two cases, the Supreme Court majority not only rejected the notion of "bright line" rules in general, but this "bright line" rule in particular.
In Adams, a probate law firm failed to advise the decedent's widow the statute of limitations would expire on her wrongful death action one year after the issuance of letters of administration. Relying on advice the lawyer did provide regarding when she could file an action as to claims against the estate itself, she waited too long to file her wrongful death action. The estate filed a summary judgment motion based on the statute of limitations in the wrongful death action. Another attorney represented the widow and opposed summary judgment, claiming the estate was estopped from raising this defense. The trial court denied summary judgment on other grounds and over a year later the parties settled the wrongful death suit.
Less than a year after the settlement of the wrongful death action, the widow-client filed a legal malpractice action against the probate lawyer. This was almost six years after she belatedly filed the wrongful death action, almost seven years after the statute of limitations expired on the wrongful death action, and over two years after the probate lawyer filed a document in the summary judgment motion conceding his malpractice. The trial court sustained the probate attorney's demurrer, holding the client had suffered "actual injury" when the statute of limitations expired on her wrongful death lawsuit, nearly seven years before she filed her legal malpractice action.[9] The appellate court affirmed, but picked a different time of "actual injury"the date when the client engaged counsel to oppose the summary judgment motion.
The Supreme Court accepted the case, in part to resolve a conflict in appellate *240 decisionsFinlayson v. Sanbrook having decided actual injury occurred at the time the statute expired in the underlying action[10] and Pleasant v. Celli finding the injury was not actual until the trial court dismissed the underlying action on grounds the statute had expired.[11] The appellate court in Adams having selected yet a third date, the high court stepped in.
The Supreme Court began by reiterating basic principles from Budd v. Nixen and Laird v. Blacker.[12] I repeat them, because they have special relevance to the case before this court. "`[T]he fact of damage rather than the amount is the relevant consideration.... In addition, the character or quality of the injury must be manifest and palpable.' (Citations omitted.) `The mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harmnot yet realizeddoes not suffice. ...'"[13]
In applying these principles, the Supreme Court first discussed the "classic" missed statute situation, which it defined as one "in which the attorney negligently fails to file the underlying lawsuit within the applicable statutory period and does nothing further."[14] That is, neither the malpracticing attorney nor the client seeks to file the lawsuit or challenge the demise of the claim. In that instance, the client has suffered "actual injury" at the moment the statute expired because he or she has lost the benefit he or she could have gained through the lawsuit. As the Supreme Court explains it, "the right and/or remedy of recovery on the action has been substantially impaired." [15] In other words, the client has a complete legal malpractice cause of action at that moment, including the damages element of that claim, e.g., the lost opportunity to recover damages in the law suit the lawyer's malpractice now bars the client from pursuing.
The Supreme Court then turned to the many variations and permutations on the theme of the "classic" missed statute scenario and explained why oftentimes those more complex fact situations could result in "actual" not just threatened future harm first occurring after the statute expired but before a final judgment or settlement occurs in the underlying action.[16] Accordingly, it rejected the "bright line" rule announced in Pleasant v. Celli[17] requiring a final resolution of the underlying action where the client attempts to rectify the lawyer's malpractice and pursue that underlying action anyway. Ultimately, the high court remanded the case before it to the trial court with the admonition neither Finlayson nor the Court of Appeal's decision in Adams comported with "the rule we reaffirm that actual injury is generally a question of fact." Among other possible points of "actual injury" the Supreme Court instructed the appellate court to consider whether such injury occurred when the underlying statutory period expired, or when the client first opposed the *241 limitations defense, or not until the date of the settlement. "[T]he court may ... determine ... the point at which the fact of damage became palpable and definite even if the amount remained uncertain, taking into consideration all relevant circumstances."[18]
In Jordache, the court begins by summarizing the holdings of Adams. "(1) determining actual injury is predominantly a factual inquiry; (2) actual injury may occur without any prior adjudication, judgment, or settlement; (3) nominal damages, speculative harm, and the mere threat of future harm are not actual injury; and (4) the relevant consideration is the fact of damage, not the amount." [19]
It applied those principles to a factual scenario somewhat more complicated than Adams. In Jordache, the law firm allegedly failed to advise its clients they had insurance coverage for defense of a major, long running lawsuit. Accordingly, the clients paid the law firm to mount a multimillion dollar defense. When the clients replaced the original law firm for other reasons, the new law firm advised there indeed was insurance coverage. The clients then employed a third law firm to seek that coverage from the liability insurers.
Three years later, this led to a lawsuit against the insurers seeking some $30 million in reimbursements for attorneys' fees and costs the clients had laid out. Because of the original law firm's failure to advise insurance covered the defense of this action, the insurers were able to assert a "late notice" defense. The trial court agreed the notice was untimely as a matter of law, but also found the issue of prejudice remained a triable issue. The clients and the insurers then settled the insurance coverage claim for $12.5 million.
Still out of pocket for $17.5 million in defense costs they felt would have been covered by insurance except for the original law firm's negligence, the clients sued that law firm for malpractice. The law firm raised the statutory bar, claiming the clients sustained "actual injury" either when they diverted investment funds to pay defense costs (and thus lost profits they would have earned from those investments) or the insurance benefits they lost before tendering the defense to the insurers. The clients countered they did not suffer actual injury until forced to settle for less than their full defense costs. The trial court granted summary judgment on grounds the clients suffered lost profits before it even tendered the claim to the insurer. But the appellate court reversed, holding "whether [the law firm's] omissions impaired [the clients'] interests in the benefits of its insurance policies was contingent on the outcome of the [insurance coverage] action."[20]
The Supreme Court reversed the appellate court and held "actual injury" occurred before the insurance coverage litigation ended with a settlement. The high court expanded on Adams' discussion of Budd v. Nixen, and also concluded 340.6 essentially codifies that opinion's definition of "actual injury." The Jordache opinion repeatedly underscores a point which is critical to the outcome of the case before this court. To be an "actual injury" the *242 client's harm must be of such character and significance as to support an immediate legal malpractice cause of action. It is not sufficient there is a probability the client at some time in the future will have suffered an injury that will support a cause of action then. The injury must be such as would supply that element of a cause of action if it were filed now. As the Jordache opinion explains:
"Budd recognized that `actual loss or damage resulting from the professional's negligence' was an essential element of a cause of action in tort for professional negligence. (Citation omitted.) Thus, Budd held that the statute of limitations began to run when the plaintiff sustained loss or damage from the attorney's negligence that allowed the plaintiff to assert a malpractice cause of action. (Citation omitted.) In section 340.6's terms, the one-year limitations period that commences when the plaintiff actually or constructively discovers the attorney's wrongful act or omission is no longer tolled after the plaintiff sustains actual injury, i.e., when the plaintiff can plead a legal malpractice cause of action."
"`.... If the allegedly negligent conduct does not cause damage, it generates no cause of action in tort.... Hence, until the client suffers appreciable harm as a consequence of [the] attorney's negligence, the client cannot establish a cause of action for malpractice.'"[21]
Later on, the opinion returns to this theme. "The `actual injury' provision in section 340.6, subdivision (a)(1), effectively continues the accrual rule Budd established. Under Budd, the cause of action could not accrue until the plaintiff suffered actual loss or damage resulting from the allegedly negligent conduct. (Citation omitted.).... That is to say, the statute of limitations will not run during the time the plaintiff cannot bring a cause of action for damages from professional negligence."[22]
In Jordache, the Supreme Court held the clients in that case suffered injury, in the form of unpaid insurance benefits and lost profits from investment funds diverted to cover defense costs, more than sufficient in character and amount to provide the damages element of a legal malpractice cause of action. Those lost profits and benefits were "palpable and definite" and thus compensable at the time they occurred. A malpractice claim based on those lost profits and benefits could have been filed long before the settlement in the insurance coverage action. Accordingly, at that earlier point the clients had sustained "actual injury" within the meaning of 340.6 and the statute of limitations was no longer tolled.

II. IS THE MERE EXISTENCE OF A POTENTIAL CAUSE OF ACTION OR A POTENTIAL PLAINTIFF'S REQUEST FOR PAYMENT OF DAMAGES SUFFICIENTLY "PALPABLE AND DEFINITE" TO REPRESENT "ACTUAL INJURY" WITHIN THE MEANING OF 340.6?
In one important respect, the case before this court is different from Adams and Jordache and nearly every other previous decision on the issue of when a client experiences "actual injury" and loses the tolling protection provided in 340.6. The clients in these other cases lost the opportunity to seek or receive money or other *243 affirmative benefits from someone else, because of their lawyers' malpractice. Here, on the other hand, what the client lost was a defense to another person's claim to receive money from the client.
The basic scenario arises when a plaintiff has a possible cause of action against the client and the client's lawyer has done somethingor failed to do something that deprives the client-defendant of some potential defense against that cause of action. The possible cause of action might be based on an automobile accidentthe client-defendant rear-ended the plaintiff, totaling his car and injuring his back. Or, it could be a cause of action based on a breach of contractthe client defendant ordered a shipment of widgets in a contract promising payment within 30 days, and has failed to pay as yet. Or, as here, a breach of a contract to repay money the plaintiff in effect loaned the client-defendant in a rather complex business arrangement.
The nature of the cause of action appears irrelevant to determining whether and when "actual injury" occurs. To say someone owes another person a "debt" merely means the lender has a "cause of action" against the borrower for breaching the contract to repay the debt. It is an "enforceable obligation" only in the sense the lender can go to court and sue on that cause of action. If successful in that lawsuit the lender then has a judgment he can execute against the debtor's assets. Thus, the driver who rear ends another car has as much of an "enforceable obligation" to pay the damages the other driver sustained as a "debtor" does to repay a lender. That other driver can take him to court and, if successful, end up with a judgment he can execute against the defendant.
In neither instance is there an "imposition of liability" the moment the cause of action comes into existence nor the moment the potential plaintiff calls or writes and says "I want my money" (for breach of the duty you owed me.) Liability will be "accepted" if and when the defendant, whether borrower or driver, voluntarily pays the damages the plaintiff has asked for. Liability will be "imposed" in either instance, only if and when the plaintiff wins the lawsuit and obtains a judgment against the defendant.
This raises the issue whether one necessarily suffers "actual injury" for purposes of a legal malpractice action at the instant a potential cause of action comes into existence (or at the instant the potential plaintiff asks the client to pay damages he allegedly owes). Or does the client-defendant only begin to suffer "actual injury" when he makes some payment to the potential plaintiff, or starts expending money to dispute the claim, or experiences some lost benefit, such as the denial of a loan, as the result of the existence of the potential cause of action against him?
There appears to be a salient difference between malpractice which causes the client to lose a right to obtain money from another and malpractice which causes the client to lose a defense to someone else's claim to obtain money from the client. In the former the "actual injury" occurs at the instant the client loses the right. The money you could have gained from the other person if you still possessed that right constitutes the damage element for an immediate malpractice cause of action against the lawyer. But when the lawyer's malpractice only deprives the client of a defense against a claim another party may pursue against that client and may succeed in enforcing against him sometime in the future, the "actual injury" does not occur until the client pays the other party all or part of the claim or pays someone to fight back or suffers the loss of some other *244 benefit because of the existence of the claim. Until then the injury is really only "the threat of future harmnot yet realized [and hence] does not suffice."[23]
If the client attempted to file a legal malpractice action at the moment the purported cause of action came into existence, e.g., when he lost his defense to the other person's claim, or when that other person requested payment, what could the client claim as damages in his malpractice cause of action? He could only allege another person had a possible cause of action against him, which he might file in the future and which eventually might require the client to pay damages to that person sometime still further in the future? Is that prospect a "palpable and definite" injury?
No doubt the damages the client might have to pay on the claim represent a probable "future harm"and more probable once the potential plaintiff asks the client to pay him the damages he is claiming. But Jordache and the cases it cites appear to reject the notion the "threat of future harm," no matter how probable, can supply the damage element of a malpractice cause of action.[24] And, until the client is in a position to file a viable malpractice action he has not suffered an "actual injury" within the meaning of 340.6. Consequently, we must wait until that future harm materializes in one form or another. The client either makes at least some payment to the potential plaintiff, or employs some lawyer to defend against the claim, or loses some other affirmative benefit, such as a loan, because of the existence of the cause of action. Until then, the tolling period of 340.6 continues.
For this reason, appellant did not suffer "actual injury" in this case when respondent's malpractice deprived him of a defense to Taubman Realty Group Limited Partnership's (Taubman) claim, nor when Taubman sent a "demand", nor when Taubman filed a lawsuit. Instead he began sufferilg "actual injury" when he decided to resist the claim and employed a law firm to defend the lawsuitand also would have experienced "actual injury" had he decided not to resist and started making payments on the debt to Taubman.
The distinction between malpractice that costs a client a right and malpractice that loses him a defense may appear subtle, but is nonetheless real and with real life consequences for the timing of legal malpractice lawsuits. If a law firm's malpractice costs a client a right to obtain money (or some other benefit) from another, the loss is immediate. Except in the rather rare case where the client has an alternative potential legal ground for seeking that same money or benefit, he has lost the right to demand or file suit to gain that money or benefit. So, in the normal situation, there will be no further event, no claim or lawsuit from the other side, merely the immediate and permanent loss of whatever money or other benefit to which the client would have been entitled in the absence of the law firm's malpractice. That, clearly, is an "actual injury." And indeed to say it *245 was not an actual injury sufficient to end the unlimited tolling period of 340.6 would place the client in complete control of the timing of his legal malpractice lawsuit. He could commence that suit at his own convenience anytime in the future, because no other "actual injury" would have occurred nor would occur in the natural course of events.
Contrast the implications of a loss of right to obtain a benefit from another with those accompanying the loss of a defense to the other person seeking a benefit from you. In the language of the Supreme Court's Jordache decision, the loss of a right to obtain a benefit from another is, as explained above "an actual, existing injury" while the loss of a defense is a "contingent injury that might or might not arise in the future."[25]Whether this contingent injury will ever materialize as an actual injury depends upon the conduct of the other party and the persistence and success of its efforts to pursue its cause of actionand also whether the client has other defenses to the claim. When it materializes as an actual injury depends on the conduct of both the other party and the client. The other party must first demand payment of the damages it claims to have suffered and, if that fails to yield results, then file a lawsuit. The client either pays immediatelyand turns the contingent injury into an actual injury at that pointor ignores the demand and hopes it goes away. If the client adopts this latter course and the other party files a lawsuit, the client either pays at that time or hires a lawyer to defend the lawsuit to the bitter end or perhaps to negotiate a lesser payment. But either way the client turns the "contingent injury" into an "actual injury." The "actual injury" comes either in the form of a payment to the other party or a legal fee to the client's lawyeror possibly the loss of some other affirmative benefit, such as a loan, because of the mere existence of the cause of action.
In this "lost defense" scenario, delaying until the "contingent injury" materializes as an "actual injury" does not result in an open-ended statute of limitations for the legal malpractice suit. Unlike the "lost right" situation discussed above, the client will experience an "actual" out of pocket loss, or not, within a determinable time period. If the other party does not obtain payment or file a lawsuit within the statute of limitations period on its claim, the client will never have an "actual injury," hence will have no damages to claim in a legal malpractice lawsuit. On the other hand, anytime the client pays the other party all or any part of the other party's claim with or without a lawsuit having been filed against himhe suffers "actual injury" and the tolling of the legal malpractice lawsuit comes to an end. Similarly, if he decides to resist the demand or the lawsuit by hiring a lawyer, once again the client's "contingent injury" has turned into an "actual injury" and the tolling period ends. Or even if the client seeks a loan and is denied or forced to accept less favorable terms because of the mere existence of this potential cause of action, the injury will no longer be "contingent" but "actual." Consequently, no matter what happens the tolling period is not open-ended, but closes either when the contingency upon which the injury depends expires or when it materializes as an "actual injury" because of the other party's action and the client's reaction.
On this issue, Foxborough v. Van Atta[26] appears to be weak dictum, at best. The *246 facts of that case involved a lost right not a lost defense. And even the dictum which arguably embraces a "lost defense" appears ambiguous on that question. That language is "when malpractice results in the loss of a right, remedy, or interest, or in the imposition of a liability, there has been actual injury regardless of whether future events may affect the permanency of the injury or the amount of monetary damages eventually incurred."[27] For reasons expressed more fully above, it seems a stretch to construe malpractice resulting in the loss of a defense to a potential cause of action as malpractice causing an "imposition of liability." Furthermore, in such a case future events will not just "affect the permanency of the [actual] injury" but whether the injury will remain merely contingent or become "actual"whether it remains but a "threat of future harm" or an immediate, "palpable and definite" injury sufficient to furnish the damage element of a legal malpractice cause of action.
The majority opinion cites Yandell v. Baker[28] for the proposition the mere existence of a debt constitutes "actual injury", based on the language "[o]nce ... the liability for payment of [higher income tax rates] arose ... the damage was done...."[29] But, placed in context, this statement in Yandell supplies no support for this proposition. The Yandell court was not focused on the issue of what constitutes an "actual injury"a "palpable and definite" injurywithin the terms of 340.6 or Budd v. Nixen. For, Yandell was applying an earlier and very different test of when the legal malpractice limitations period commenced and expired. Under that test, as quoted in Yandell, the "statute begins to run at the time when the negligence or breach of duty occurs, not at the time when it is discovered or actual damage results. ..."[30]Budd v. Nixen and the formula enacted in 340.6 effectively turned that old test on its head. Now, what counts is not when the breach occurred but when that breach is discovered and when "actual damage" results.
Indeed the language in the Yandell opinion about when the "damage was done" referred to something much different than a finding about when "actual damage" occurred or a legal malpractice action accrued. Instead this language responded directly to the client's contention the lawyer's responsibilities extended beyond the time of the dissolution and transfer of assets and "until the conclusion of the above stated recommended tax program."[31] The court explained the date the lawyer's responsibilities ended was "immaterial" in applying its test for when the limitations period commenced, e.g., the date of the lawyer's malpractice. Those acts "occurred at the time of advising the tax program and the dissolving of the corporation."[32] The client had cited a case where the law firm's representation stretched well beyond the time when the affirmative acts of malpractice occurred. In that case, the appellate court had held the limitations period did not commence with those affirmative acts because the *247 attorney had the opportunity and the duty to reverse his mistakes later in his representation before they caused harm. In other words, those acts of malpractice had been remediable later in the period of the law firm's representation.
This was the context in which the Yandell court wrote the statement on which the majority opinion relies. "Once [the client's corporation] was dissolved and its assets were distributed, the liability for payment of ordinary income rates, rather than capital gains rates, arose and the damage was done ...."[33]
Thus, it is apparent the Yandell court was not holding the mere creation of a tax liability constituted "actual injury" within the meaning of 340.6 and thereby fixed the date of "actual injury." Rather the court was fixing the date of the lawyer's act of malpractice, which under its test commenced the running of the malpractice statute of limitations, and explaining why the lawyer's continued representation of the client after those acts of malpractice was simply irrelevant. In that context, the phrase "the damage was done" merely meant the acts of malpractice had occurred and, unlike the case on which the client relied, it was too late to reverse course. The "damage was done" was a colloquial way of saying the malpractice was irremediable later in the lawyer's representation of the client. The Yandell court could have chosen to use a similar saying to make the same point, "the bell couldn't be unrung." But that would not mean ringing bells had anything to do with the definition of "actual injury" under 340.6. All the Yandell court meant to convey with these words was its conclusion any subsequent work the lawyer did for the client on the matter had nothing to do with the date the limitations period commenced.
The other tax liability case the majority cites, United States v. Gutterman[34] provides slim support for the position actual injury occurs the moment a private debt comes into existenceor when the purported creditor requests payment. A tax assessment by the Internal Revenue Service after a thorough examination is an official government action. The taxpayer must either immediately contest the assessment in the U.S. Tax Court or pay the taxes and sue for their return. This is far different from a private citizen writing a letter requesting payment of the damages he claims the client owes on a cause of action he might otherwise file in court. Moreover, by the time of the tax assessment in Gutterman the client had expended considerable funds for legal and accounting services to defend his interests during the IRS examination, seeking to avoid the consequences of his lawyer's alleged malpractice. Those expenditures were enough by themselves to constitute "actual injury."
For these reasons, I conclude Taubman's letter requesting Seheult pay the debt Taubman claimed he owed did not, at that moment, as yet represent a "palpable and definite" injury sufficient to constitute the damage element of an immediate legal malpractice claim against the Jeffers law firm. On the record before the trial court the first "palpable and definite" injuries occurred significantly later, after Taubman filed the threatened lawsuit and Seheult employed counsel to defend that suit. Only then did the tolling period provided in 340.6 come to an end. The record also reflects Seheult filed his lawsuit well within a year after this tolling period expired, *248 and thus his legal malpractice action was timely.
NOTES
[*] In denying review, the Supreme Court ordered that the opinion be not officially published. (See California Rules of CourtRules 976 and 977).
[1] Seheult concedes he first discovered the alleged negligence more than a year before he filed his complaint. Therefore the only issue in this case is the applicability of the "actual injury" tolling provision.
[2] We confess to some skepticism regarding Seheult's claim that Taubman would have permitted him to shift his personal liability to Shannon-Brooke after the partnership was formed. However, Seheult claims such a shift would have happened absent the lawyers' negligence; and, for purposes of the statute of limitations analysis, we take him at his word.
[3] Seheult has abandoned [on appeal] his third cause of action for breach of oral contract. At the hearing on the motion for summary judgment, Seheult contended the first and second causes of action were different and sought damages for different injuries. The trial court rejected this argument, observing that the second cause of action incorporated all the allegations of the first cause of action, and stating "you can't split the cause of action and seek different damages and ... apply different statutes of limitation." Aside from a single conclusory sentence Seheult has failed to address this issue on appeal, and we therefore consider it waived. (Mansell v. Board of Administration (1994) 30 Cal.App.4th 539, 545, 35 Cal.Rptr.2d 574 [if no argument is furnished on a point, the Court of Appeal may treat it as waived].)
[4] Seheult purports to dispute certain facts relating to these issues. However, the difference between the parties' versions of the facts is not material. The point is that the parties were no longer communicating about the partnership after May 27, 1997, and Seheult was aware the lawyers were no longer actively working on its formation.
[5] It is somewhat misleading, although technically true, for the dissenting opinion to characterize this case as involving merely the loss of a defense to a claim. Sehuelt's position is that the claim itself would not exist but for his former lawyers' alleged malpractice.
[1] Majority Opinion at page 235, quoting from a Court of Appeal opinion, Foxborough v. Van Atta (1994) 26 Cal.App.4th 217, 227, 31 Cal. Rptr.2d 525. Majority Opinion at page 235, quoting again from Foxborough, supra, but also citing Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison (1998) 18 Cal.4th 739, 750, 76 Cal.Rptr.2d 749, 958 P.2d 1062, for this same proposition, presumably because the Supreme Court included this quotation from Foxborough in parentheses when it listed that case, along with several others for the general proposition an "actual injury may consist of impairment or diminution, as well as the total loss or extinction, of a right or remedy." (Ibid; italics added.)
[2] (1992) 2 Cal.4th 606, 7 Cal.Rptr.2d 550, 828 P.2d 691.
[3] Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison (1998) 18 Cal.4th 739, 764, 76 Cal.Rptr.2d 749, 958 P.2d 1062.
[4] (1994) 9 Cal.4th 245, 36 Cal.Rptr.2d 552, 885 P.2d 965.
[5] Adams v. Paul (1995) 11 Cal.4th 583, 588-589, 46 Cal.Rptr.2d 594, 904 P.2d 1205.
[6] Jordache, supra, 18 Cal.4th at p. 764, 76 Cal.Rptr.2d 749, 958 P.2d 1062.
[7] Laird v. Blacker, supra, 2 Cal.4th at p. 615, 7 Cal.Rptr.2d 550, 828 P.2d 691.
[8] Jordache, supra, 18 Cal.4th at pp. 765-769, 76 Cal.Rptr.2d 749, 958 P.2d 1062
[9] In reaching this decision, the trial court relied on a recent Court of Appeal opinion, Finlayson v. Sanbrook (1992) 10 Cal.App.4th 1436, 13 Cal.Rptr.2d 406. (Adams v. Paul, supra, 11 Cal.4th at p. 587, 46 Cal.Rptr.2d 594, 904 P.2d 1205.)
[10] Finlayson v. Sanbrook, supra, 10 Cal. App.4th at p. 1444, 13 Cal.Rptr.2d 406.
[11] Pleasant v. Celli (1993) 18 Cal.App.4th 841, 850, 22 Cal.Rptr.2d 663.
[12] Budd v. Nixen (1971) 6 Cal.3d 195, 98 Cal.Rptr.2d 849, 491 P.2d 433; Laird v. Blacker (1992) 2 Cal.4th 606, 7 Cal.Rptr.2d 550, 828 P.2d 691.
[13] Adams v. Paid, supra, 11 Cal.4th at p. 589, 46 Cal.Rptr.2d 594, 904 P.2d 1205.
[14] Adams v. Paul, supra, 11 Cal.4th at p. 589, 46 Cal.Rptr.2d 594, 904 P.2d 1205, emphasis supplied.
[15] Adams v. Paul, supra, 11 Cal.4th at p. 589, 46 Cal.Rptr.2d 594, 904 P.2d 1205.
[16] Adams v. Paul, supra, 11 Cal.4th at p. 591, 46 Cal.Rptr.2d 594, 904 P.2d 1205.
[17] Adams v. Paul, supra, 11 Cal.4th at p. 591, fn. 4, 46 Cal.Rptr.2d 594, 904 P.2d 1205.
[18] Adams v. Paul, supra, 11 Cal.4th at p. 593, 46 Cal.Rptr.2d 594, 904 P.2d 1205, emphasis supplied.
[19] Jordache, supra, 18 Cal.4th at p. 743, 76 Cal.Rptr.2d 749, 958 P.2d 1062, emphasis supplied.
[20] Jordache, supra, 18 Cal.4th at p. 747, 76 Cal.Rptr.2d 749, 958 P.2d 1062.
[21] Jordache, supra, 18 Cal.4th at pp. 749-750, 76 Cal.Rptr.2d 749, 958 P.2d 1062, emphasis supplied.
[22] Jordache, supra, 18 Cal.4th at p. 751, 76 Cal.Rptr.2d 749, 958 P.2d 1062.
[23] Adams v. Paul, supra, 11 Cal.4th at p. 589, 46 Cal.Rptr.2d 594, 904 P.2d 1205.
[24] In deciding whether a client could assert the mere existence of a debt as a damage element in the malpractice cause of action, one must assume the case would go to trial in the same factual posture as exists at the moment the hypothetical case would be filed. That is, one cannot assume even probable "future harms" would occur, such as the purported debtor filing a lawsuit, the client having to pay on the debt, or pay another lawyer to defend the claim, or the client being denied a loan or other benefit because of the debt. One would have to assume he would be asking the judge or jury to award him damages for a debt he had not paid and might never have to pay or defend against.
[25] Jordache, supra, 18 Cal.4th at p. 754, 76 Cal.Rptr.2d 749, 958 P.2d 1062, italics omitted.
[26] Foxborough v. Van Atta, supra, 26 Cal. App.4th 217, 31 Cal.Rptr.2d 525.
[27] Foxborough v. Van Atta, supra, 26 Cal. App.4th at p. 227, 31 Cal.Rptr.2d 525.
[28] Yandell v. Baker (1968) 258 Cal.App.2d 308, 65 Cal.Rptr. 606.
[29] Yandell v. Baker, supra, 258 Cal.App.2d at p. 314, 65 Cal.Rptr. 606, quoted at Majority Opinion at page 235.
[30] Yandell v. Baker, supra, 258 Cal.App.2d at pp. 314-315, 65 Cal.Rptr. 606, emphasis supplied.
[31] Yandell v. Baker, supra, 258 Cal.App.2d at p. 314, 65 Cal.Rptr. 606.
[32] Yandell v. Baker, supra, 258 Cal.App.2d at p. 314, 65 Cal.Rptr. 606.
[33] Yandell v. Baker, supra, 258 Cal.App.2d at p. 314, 65 Cal.Rptr. 606, emphasis supplied.
[34] United States v. Gutterman (9th Cir.1983) 701 F.2d 104.